**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SOUNDBOARD ASSOCIATION, | ) | |
| | ) | |
| 3400 Ashton Blvd, #490 | ) | |
| Lehi, UT  84043, | ) | |
| | ) | |
| Plaintiff, | ) | COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FEDERAL TRADE | ) | |
| COMMISSION, | ) | |
| | ) | |
| 600 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C.  20580, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

1.      The Soundboard Association ("SBA") brings this action against the United States Federal Trade Commission ("FTC") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, the United States Constitution, and the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, challenging the FTC's action of substantively amending its Telemarketing Sales Rule ("TSR") without having first provided public notice of the intended amendment and affording an opportunity for public comment, as the law requires.

2.      Specifically, on November 10, 2016, the FTC's Bureau of Consumer Protection ("BCP"), Division of Marketing Practices, issued a letter that, in practical effect, binds for the first time an entire sector of the telemarketing sales industry—including the SBA's members— under the so-called "robocall" provision of the TSR, 16 C.F.R. § 310.4(b)(1)(v), despite that sector's use of telemarketing sales practices that do not come within the four corners of that provision.  Although addressed as a private letter to a single individual, the FTC letter expressly

states that affected "industry" would be given six months (until May 12, 2017) "to make any necessary changes to bring themselves into compliance" with the robocall prohibition. *See* Ex. 1 (Letter from Lois C. Greisman, Associate Director, Division of Marketing Practices, to Michael Bills, CEO of Call Assistant, LLC (Nov. 10, 2016)). That letter has now also been posted to the FTC's website. *See* https://www.ftc.gov/policy/advisory-opinions/letter-lois-greisman-associate-director-division-marketing-practices. As used in the remainder of this Complaint, this letter will be referred to as the "November 10 letter."

3.     SBA's member companies include manufacturers and users of soundboard technology (described at greater length below), which many companies operating within the telemarketing sales industry, including call centers, use and rely on to improve the sales-call experience. In contrast to a "robocall" — that is, a prerecorded, and thus *one-way*, telemarketing sales message that does not involve interaction with a live sales representative or agent or other human involvement — soundboard technology involves a two-way communication between the sales agent and the consumer, in which the sales agent uses audio clips to provide relevant, responsive information to the consumer. At all times, the sales agent is present, is listening, and remains involved in the call.

4.     The robocall prohibition was promulgated by the FTC in 2008, following notice-and-comment rulemaking, and took effect in September 2009. *See* 73 Fed. Reg. 15204 (Aug. 29, 2008). By its terms, it does not apply to calls that utilize soundboard technology. That this is so is also apparent by the fact that, among other things, no entity using soundboard technology for telemarketing sales purposes has ever been approached by the FTC—*until now*—and told that its use of this technology violates the robocall prohibition, despite the FTC having been aware of the industry's use of soundboard technology since the robocall prohibition went into effect seven

years ago.  Indeed, even while some telemarketers have violated applicable federal telemarketing and consumer protection laws while using soundboard technology, the FTC has not, to date, ever seen cause to base an enforcement action on *the use of soundboard technology* — the telemarketers' conduct has been deemed unlawful under *other* provisions of law. *See*, *e.g.*, *United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258, 1263 (D. Utah 2015) ("Defendants use prerecorded audio snippets to conduct telemarketing.  An employee initiates a call then plays certain snippets depending on the consumers' response.  The FTC alleges that the snippets Defendants used in past campaigns contained misleading statements.").

5.      The November 10 letter is the FTC's final pronouncement on this matter.  And it has legal consequences.  By its terms, it gives the affected "industry" a hard six-month deadline of May 12, 2017 to stop using soundboard in order to come "into compliance" with the robocall prohibition.  The effect of the FTC's action is certain: it will significantly drive down demand for soundboard technology, which in turn will cause many of SBA's member companies to lay off thousands of employees, if not go out of business entirely.  Many call centers that employ soundboard as an integral component of their business-delivery systems will also suffer dramatically by what, in essence, will be a total ban on soundboard in sales telemarketing originating within the United States.

6.      The impact will be felt further still, beyond mere telemarketing sales, by reaching fully protected charitable and other nonprofit advocacy calls.  The letter subjects soundboard calls made by fundraisers on behalf of charitable organizations to differential regulation based on the content of the message — *i.e.*, charitable calls requesting support from prospective members or first-time donors are prohibited, but calls requesting support from members or prior donors are permissible.  Accordingly, the letter violates SBA members' and their nonprofit clients' First

Amendment right to free speech.

7.      Thus, the stigma that the FTC's newly adopted treatment of soundboard calls as robocalls will have on the use of soundboard in a broader array of industries and uses will be detrimental.  It will also have negative employment consequences for many employees from traditionally under-employed segments of the population, including the "inner city" and disabled populations.

8.      Meanwhile, the FTC's position will do nothing to stem abusive telemarketing sales techniques that it wrongly and without factual support associates now with soundboard calls.  Effectively shutting down American call centers will only increase the use of offshore call centers that can more readily evade FTC enforcement of any type.

9.      The November 10 letter operates as a legislative rule, but was not promulgated according to the procedures required for legislative rules.  The SBA brings this action under the APA and DJA for injunctive and declaratory relief against the FTC.  The November 10 letter should be vacated.

## JURISDICTION AND VENUE

10.     The November 10 letter constitutes final agency action: it represents the consummation of the FTC's decisionmaking on the relationship of the robocall prohibition to soundboard technology, and it also determines obligations of companies and organizations using soundboard technology, for which there will be legal consequences should those newly imposed obligations not be honored.  Because the SBA has no other adequate remedy in law for challenging the November 10 letter, it has a cause of action under the APA and the DJA, over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

11.     The SBA has standing because its members are directly affected by the November 10 letter, the protection of its members from the type of harm caused by the November 10 letter

is within the heartland of the SBA's mission and purpose, and no facts specific to any individual member need be decided that would otherwise necessitate the participation of that individual member company as a plaintiff in this lawsuit.

12.    Through the APA, the United States has waived sovereign immunity from this lawsuit.

13.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the FTC resides in this judicial district, and the actions that are the subject of this Complaint were taken, at least in material part, in this district.

## PARTIES

14.    The SBA is a national association of manufacturers and users of soundboard technology.  Its mission is to promote and protect the responsible use of soundboard in conformity with all applicable laws and regulations.  Its headquarters are in Lehi, Utah.

15.    The FTC is an independent federal agency of the United States Government.  Its headquarters are in Washington, D.C.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I.    Regulation of Telemarketing Activities

16.    Telemarketing — broadly defined as the use of the telephone for sales and some fundraising activities — is subject to federal regulation.

17.    In 1994, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act to, among other things, prevent consumers from deceptive and abusive forms of telemarketing.  *See* Pub. L. 103-297 § 2, 108 Stat. 1545 (1994), 15 U.S.C. § 6101 *et seq.* ("Telemarketing Act").  Section 3 of the Telemarketing Act directs the FTC to, among other things, "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).

18.     The Telemarketing Act requires the FTC to comply with the APA's rulemaking provisions, 5 U.S.C. § 553, in any rulemaking undertaken pursuant to that statute. 15 U.S.C. § 6102(b).

### A.     Early Iterations of the TSR

19.     Pursuant to its authority granted by the Telemarketing Act, the FTC promulgated the TSR in 1995.  *See* 60 Fed. Reg. 43842 (Aug. 23, 1995).  Among other things, the TSR in its first iteration required telemarketers to provide certain information, including: (1) the name of the seller; (2) that the call was for the purpose of selling goods or services; and (3) a description of the goods or services being offered.  The TSR prohibited misrepresentations about the goods or services.  It also contained certain consumer financial information protections, limited the times during which sales calls could be made, and prohibited prospective calls to consumers who requested that the seller not call them.  Regarding the "do-not-call" provision, with a live call agent, the consumer can simply request at any time during the call to be placed on the seller's list.  With an automated call, it is more difficult.

20.     In that first iteration, the TSR did not contain a robocall prohibition.

21.     In 2003, the FTC amended the TSR in a number of ways.  Relevant here, the 2003 amendments prohibited "call abandonment," which occurs when a telemarketer simultaneously places multiple phone calls (to optimize consumer contact) but then, after connecting with one consumer, either hangs up on or leaves unattended other consumers who answer any of the other calls that were placed simultaneously by the caller.  The call abandonment prohibition made it illegal for a telemarketer to place an outbound call if it could not connect the call to a human sales representative within two seconds of the call being answered by a person.  Although the call abandonment prohibition contained a safe harbor, applicable where certain conditions were met, a telemarketer exclusively using "a prerecorded message" would not satisfy the safe harbor

6

and would inevitably violate the prohibition because the consumer could never be connected with a human sales representative. *See* 73 Fed. Reg. at 51165 (explaining the call abandonment prohibition). (Accordingly, as of the 2003 promulgation of the call abandonment prohibition, the TSR effectively prohibited the use of a call delivering a prerecorded message for telemarketing, except where certain conditions were met.)

22.     Another way the FTC amended the TSR in 2003 was to incorporate relevant provisions of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), which expanded the definition of "telemarketing" under the Telemarketing Act to include calls intended to induce "a charitable contribution, donation, or gift of money or any other thing of value." 15 U.S.C. § 6106(4)). The PATRIOT Act also added "fraudulent charitable solicitations" as a deceptive practice and directed the FTC to propose rules with respect to same. 15 U.S.C. § 6102(a)(2). However, Congress neither defined "charitable organization" for purposes of amending the TSR nor altered the jurisdictional provisions in the Telemarketing Act, thus leaving the FTC without jurisdiction over nonprofit organizations. To reconcile those two congressional mandates, the FTC articulated the following position:

> Reading the amendments to the Telemarketing Act effectuated by § 1011 of the USA PATRIOT Act together with the unchanged sections of the Telemarketing Act compels the conclusion that for-profit entities that solicit charitable donations now must comply with the TSR, although the Rule's applicability to charitable organizations themselves is unaffected.

68 Fed. Reg. 4580, 4585 (Jan. 29, 2003).

23.     While the term charitable organization is not defined under the TSR, it generally includes a variety of organizations speaking to charitable, religious, educational, social and political causes. *See Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). Paid speakers are entitled to the same First Amendment protection as the charitable

organizations themselves. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988). Notwithstanding, in 2008, the FTC banned paid fundraisers from delivering prerecorded messages on behalf charitable organizations to prospective members, thereby effectively banning prerecorded message calls requesting a first-time contribution or new membership. 73 Fed. Reg. at 51193. The FTC amended the TSR accordingly, 16 C.F.R. § 310.4(b)(1)(v)(B), but subsequently confirmed that this new robocall provision does not apply to calls made using soundboard.

### B.      The TSR's Explicit Robocall Prohibition

24.     In everyday jargon, the term "robocall" refers to the type of call that the 2003 call abandonment prohibition implicitly prohibited, *i.e.*, delivery of a prerecorded message, in a one-way communication that never allows the answering consumer the opportunity to converse with a live agent. Among other things, robocalls more frequently frustrate the ability of the consumer to be placed on a seller's do-not-call list because there is not a live call agent on the other line to whom that request can be made.

25.     In 2004, the FTC was petitioned by an interested party to amend the TSR's call abandonment prohibition to permit telemarketers to deliver a prerecorded message when contacting consumers with whom the seller (on whose behalf the telemarketer was calling) had an established business relationship — basically requesting an additional exemption, or safe harbor. The FTC published a notice of proposed rulemaking on this subject and announced that, during the pendency of the rulemaking, it would forbear on taking enforcement actions against sellers and telemarketers who used a prerecorded message consistent with the terms of the proposed amendment (*i.e.*, only with consumers with whom the sellers had an established business relationship). *See* 69 Fed. Reg. 67287, 67290 (Nov. 17, 2004).

26.     What resulted, following public comment, was an amended TSR that was

different from what the petitioning party had sought.  First, the FTC denied the requested safe harbor and withdrew its interim policy of forbearance.  Second, the FTC proposed its own amendment to explicitly prohibit the delivery of a prerecorded message in telemarketing sales calls — *i.e.*, robocalls — except where the consumer has signed an express written agreement authorizing the seller to place the call to the given telephone number.  *See* 71 Fed. Reg. 58716, 58726 (Oct. 4, 2006).

27.    The FTC promulgated the express robocall prohibition in August 2008.  Subject to an exception not relevant to this lawsuit, the robocall prohibition makes it illegal (as an "abusive" telemarketing act) to "[i]nitiat[e] any outbound telephone call that delivers a prerecorded message."  16 C.F.R. § 310.4(b)(1)(v).

28.    The target of the robocall prohibition rulemaking was one-way calls that did not involve interaction with a human in real time.  That is clear from the preamble to the final rulemaking, which emphasized that receiving a call when there is "no human being on the other end of the line" is uniquely intrusive and "immeasurably" more invasive than a regular marketing call.  73 Fed. Reg. at 51180.  Elsewhere in the preamble, the FTC justified the new rule by referring to the heightened invasion of privacy that consumers experience "when the call they answer converts a two-way instrument of communication into a one-way broadcast of a prerecorded advertisement."  *Id.* at 51177.

## II.    Soundboard Technology

29.    Although telemarketing has existed for several decades, soundboard technology is a decidedly modern innovation, one that relies on technological advances made within the last 15 years.  It works by allowing highly trained and skilled call center agents to interact and converse with consumers on a real-time basis using recorded sound files.  So, for example, if a call recipient asks a particular question during a conversation, the listening agent will respond by

playing an appropriate audio clip that the agent manually selects to answer the recipient's question.  A video attached to this complaint shows how soundboard works.  *See* Ex. 6 (Video provided by Call Assistant, LLC, to FTC (Nov. 12, 2012)).

30.     Soundboard technology is not a prerecorded messaging platform or robocall system.  Unlike those technologies, soundboard technology does not replace "live agent" interaction; it merely provides a proxy voice through which live agents may interact with call recipients.  An agent using soundboard technology remains able to converse with call recipients using his or her own voice, but may also converse with them by selecting and substituting appropriate audio clips for his or her own voice in such a way that the consumer experiences a natural conversation.  Agents using soundboard technology converse with consumers throughout the entire call by listening to their comments, questions, and responses, and responding to them with compliant and well-scripted statements.  By way of comparison:

| TRADITIONAL ROBOCALL | SOUNDBOARD TECHNOLOGY |
|---|---|
| No human interaction | Always human interaction |
| One-way communication | Two-way communication |
| Unclear communication | Clear communication |
| No response when call recipients request to be placed on do-not-call list | Responsive to call recipients' requests to be placed on do-not-call list |

31.     Soundboard technology also has many distinct advantages over traditional sales or fundraising calls, which typically rely on a live agent reading from a script.  Among other things,

the use of soundboard technology:

- Guarantees that all mandatory disclosures, including the terms and conditions of an offer in a sales call, are conveyed to call recipients;

- Permits do-not-call requests to be tracked from the call recipient's request to disposition, and can be used to deter or prevent agents from terminating calls when the consumer asks to be placed on the do-not-call list;

- Keeps agents from misstating programs or activities in fundraising calls or offers, incentives, or other terms and conditions in sales calls;

- Eliminates the effects of "human foibles" (*e.g.*, episodic rudeness, impatience, raised voice) in the course of calls;

- Prevents agents from going off script during calls or engaging in high pressure sales tactics;

- Gives businesses more control over what information is presented to call recipients;

- Ensures that the information is presented in a manner that consumers can understand (*e.g.*, by ensuring proper enunciation, grammar, and cadence), which facilitates better consumer understanding and employment of people with strong accents, speech impediments, or disabilities that could otherwise preclude employment as a call center agent; and

- Reduces the cost of sales and fundraising calls, which allows United States call centers to better compete with offshore ones.

*See* Ex. 7 (PACE Soundboard Technology White Paper (Feb. 26, 2016)).

32.     Today, there are numerous U.S. businesses whose primary revenue is derived

from the sales and use of soundboard technology.  These companies provide soundboard technology for hundreds of U.S. companies that conduct telemarketing and fundraising calls. These companies employ soundboard technology for the purpose of improving legal compliance, providing a better consumer experience, and controlling operating costs.  Losing the ability to use soundboard technology will negatively impact these benefits.

33.    Soundboard has other employment-related benefits, in particular for individuals with health issues or disabilities.  For example, a person with a speech impediment, asthma, lung ailment, or other health or confidence issues that impede his or her ability to speak clearly or for long periods of time can, with soundboard, converse with a consumer using the recorded audio files while having the ability to interject his or her own voice or connect the call to a supervisor in the event the consumer asks a question for which no recorded response exists.  Similarly, an individual with the ability to understand but not clearly speak the consumer's language, or who speaks with an accent unfamiliar to the consumer, could assist the consumer just as well as a speaker fluent in the language of the call (typically English within the United States).  Without this technology, such people are not as easily employable as call center agents.

III.    SBA Member Companies

34.    The SBA was founded in 2015 with the mission to promote the use of soundboard technology across a broad array of industry platforms consistent with the highest standards of conduct in consumer engagement.  The SBA is composed of both manufacturers and users of the technology.  It was formed in response to negative and frequently misleading or inaccurate press about the technology and its use in telemarketing and for other purposes.  The association's goals include: (1) serving as the "moral compass" for the soundboard industry, and to that end supporting, teaching, and encouraging the ethical use of soundboard technology; (2) educating and lobbying at both the local and national levels on behalf of soundboard regarding the ethical

use of the technology and its value proposition to consumers; and (3) helping educate consumers on the technology and the positive benefits it affords them.

35.     Soundboard is employed by call centers around the country and throughout the world.   SBA members' soundboard software packages help call centers achieve better compliance and security, and improve the consumer call experience.   For the manufacturer members, the soundboard products are usually the dominant source of their revenue.

36.     SBA member companies employ approximately 3,000 employees throughout the United States.   Most of these jobs are long-term, full-time jobs, frequently providing employment to unskilled workers in depressed job markets.   Employees are provided with computer training, a comfortable work environment, and better-than-average income within the unskilled labor class of jobs.   Many are involved in fundraising for well-known charities.

37.     To promote the use of soundboard and assist its users in achieving compliance with all federal and local laws, including the TSR, the SBA adopted a Code of Conduct that, among other things, emphasizes that members will commit to:

- "[F]ollow the standards set forth [in the Code] as well as applicable federal and state laws and regulations";

- "Treat customers with courtesy, dignity and respect"; and

- "Not engage in undue sales pressure or unfair, deceptive or abusive tactics."

Ex. 5 (Soundboard Association Code of Conduct).

## IV.     Events Leading to the November 10 Letter

38.     Because sales and fundraising calls that use soundboard technology fall within the meaning of "telemarketing," they are subject to the TSR.   But, because they are inherently not the "delivery of a prerecorded message," they are not covered by the TSR's robocall prohibition.

39.     Since the FTC promulgated the robocall prohibition, it has been widely understood that the prohibition did not apply to outbound calls made using soundboard.  That is because it has been widely understood that the robocall prohibition is not principally concerned with whether every outbound communication is conducted by a live agent using solely his or her own voice; only that the conversation be two-way, responsive to the consumer's questions or comments, and otherwise compliant with the TSR.  Soundboard not only accomplishes those goals, but it is designed specifically to facilitate compliance with the TSR.  For that reason, call centers and other telemarketing companies have, for the past seven years, employed soundboard in their day-to-day operations without enforcement reprisals from the FTC (if they were otherwise compliant with the TSR).

40.     That the robocall prohibition does not apply to calls made using soundboard technology was confirmed in an earlier letter from the same FTC division that issued the November 10 letter.  *See* Ex. 2 (Letter from Lois C. Greisman, Associate Director, Division of Marketing Practices, to Michael Bills, CEO of Call Assistant, LLC (Sept. 11, 2009)).  Throughout the remainder of this Complaint, this letter will be referred to as "the 2009 letter."

41.     The 2009 letter was a response to a letter from the CEO of a company — Call Assistant, LLC — that, like SBA's members, employed soundboard technology for telemarketing purposes.  Throughout the remainder of this Complaint, the letter from the CEO of Call Assistant, LLC will be referred to as the "Call Assistant letter."

42.     The Call Assistant letter sought confirmation from the FTC that the robocall prohibition did not apply to calls made using soundboard technology.

43.     In relevant part, the Call Assistant letter appropriately described a call using soundboard technology as follows:

A live agent using [soundboard technology] places a call to a consumer and hears the consumer greeting.  In response to the greeting, the agent may elect to speak to the call recipient using his or her voice, or may press a button to play an appropriate recorded script segment.  After the agent's response, the agent listens to the consumer customer's reply.  After listening to the consumer's reply, the live agent again chooses whether to speak to the call recipient in his or her own voice, or another recording.  At all times, even during the playing of any recorded segment, the agent retains the power to interrupt any recorded message to listen to the consumer and respond appropriately.

44.    The question posed by the Call Assistant letter was whether a call of that type came within the robocall prohibition.  In no uncertain terms, the FTC stated in the 2009 letter that the answer was "no."  It reached that conclusion based on the plain meaning and purpose of the robocall prohibition.  Among other things, the 2009 letter explained that:

- "The 2008 amendments at 16 C.F.R. § 310.4(b)(1)(v) [*i.e.*, the robocall prohibition] prohibit calls that deliver a prerecorded message and do not allow interaction with call recipients in a manner virtually indistinguishable from calls conducted by live operators."

- "Unlike the technology that you describe [in the Call Assistant letter], the delivery of prerecorded messages in such calls does not involve a live agent who controls the content and continuity of what is said to respond to concerns, questions, comments—or demands—of the call recipient."

- In adopting the robocall prohibition, the FTC was concerned that "when there is no human being on the other end of the line," a consumer's feeling of an invasion of privacy "may be exacerbated immeasurably."  (Citing 73 Fed. Reg. at 51180.)

- The problem with robocalls is they "convert the telephone from an instrument for two-way communication into a one-way device for transmitting advertisements." (Citing *id.*)

15

45.     In light of those observations, the FTC stated that the robocall prohibition did "not apply" to calls made using soundboard technology (consistent with the description provided in the Call Assistant letter).  The 2009 letter stated that the views expressed were those of "FTC Staff" and had not been reviewed, approved, or adopted by the Commission itself, and were not binding on the FTC.  But it concluded by stating that the views "do reflect the opinions of the staff members charged with enforcement of the TSR."

46.     The use of soundboard technology in telemarketing sales operations increased after the promulgation of the robocall prohibition precisely because calls made using soundboard technology are not robocalls — they at all times involve a live sales agent and provide for two-way communication.   The soundboard technology industry grew up relying on the plain understanding of the robocall prohibition, as confirmed by the 2009 letter from the FTC and the fact that the FTC has never (until now) given any indication that the use of soundboard technology might come within the scope of the TSR's robocall prohibition.   In fact, to the contrary, the FTC has brought TSR actions against sellers and telemarketers that have used soundboard technology only where it has alleged that the audio snippets themselves contained misleading statements; there were no allegations that the defendants' mere use of soundboard technology constituted an impermissible robocall under the TSR.   *See*, *e.g.*, *United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258 (D. Utah 2015).

47.     The first indication the industry was given that the FTC was considering subjecting calls made with soundboard technology to the robocall prohibition came in early 2016, when FTC staff contacted the Professional Association for Customer Engagement ("PACE"), a trade association representing call centers, to advise it that the FTC was contemplating reversing the position it had taken in the 2009 letter.  PACE promptly shared that

information with the SBA.

48.     In March 2016, representatives from SBA and PACE met with FTC staff to discuss compliance concerns involving the TSR.  Following that meeting, and throughout the spring and summer, counsel for SBA periodically touched base with FTC staff to stay apprised of the FTC's intentions related to soundboard.

49.     On September 20, 2016, at a meeting with PACE, FTC staff members were asked about the status of their deliberations on soundboard and when or whether FTC staff would engage industry in further discussions.  Staff responded that discussions with industry would continue "soon," but did not provide further detail.  The following day, FTC staff emailed counsel for SBA and PACE a draft letter setting out the FTC's position on soundboard that was ultimately adopted in the November 10 letter.  *See* Ex. 3 (Draft Letter from Lois C. Greisman, Associate Director, Division of Marketing Practices, to Michele Schuster, General Counsel for PACE, and Peter Miller, Counsel for SBA (Sept. 21, 2016)).  As used in the remainder of this Complaint, that draft letter will be referred to as the "September 2016 draft letter."

50.     The September 2016 draft letter contained or reflected a number of factual errors or oversights.  Among other things, that draft asserted:

- that the FTC had received numerous consumer complaints that calls using soundboard were not actually being manned by live agents and that the technology was not responding appropriately to consumer questions or concerns;

- that soundboard was being utilized to increase the number of calls a call center could make;

- that using soundboard to allow call agents to make multiple calls at once was inconsistent with the observation in the FTC's 2009 letter that soundboard calls

were virtually indistinguishable from calls made by live agents; and

- that soundboard calls were in fact "prerecorded messages," thus falling within the scope of the TSR's robocall prohibition.

51.     In light of the issues it identified, the FTC stated in the September 2016 draft letter that it did not believe soundboard was being utilized as conveyed in the 2009 Call Assistant letter and that, in any event, it had essentially adopted a new interpretation of the robocall provision that rendered it applicable to soundboard calls, even where a call agent using soundboard only made one call at a time. *See* Ex. 3.

52.     In response to the September 2016 draft letter, counsel for the SBA requested a meeting regarding the draft and was referred to the BCP front office.  On October 11, 2016, SBA and PACE representatives, accompanied by their counsel, met with a team from the BCP front office, as well as the FTC staff members who had been involved in deciding whether to subject soundboard technology to the robocall prohibition.  At the meeting, SBA and PACE explained why soundboard calls are not properly subject to the robocall prohibition.  *See* Ex. 4 (PowerPoint presentation from October 11, 2016 meeting).  Among other things, SBA and PACE pointed out that:

- the FTC was taking a completely one-sided view of the use of soundboard, without regard to how it actually works when used by responsible companies;

- the FTC's data on call center practices was anecdotal rather than systematic;

- the perceived problem is not soundboard technology itself (even giving the FTC the benefit of the doubt about the integrity of its data), but rather its misuse — much or all of which is subject to FTC enforcement under other provisions of the TSR;

- prohibiting the use of soundboard would do nothing to eliminate unscrupulous calling practices;

- expanding the TSR to prohibit a particular *technology*, as opposed to *poor conduct*, fails to address the problem and only punishes responsible companies who effectively use soundboard exactly as depicted in the 2009 Call Assistant letter to the betterment of the consumer; and

- if the FTC wants to ban the technology, it must pursue that policy shift through notice-and-comment rulemaking, as required by the Telemarketing Act.

53.     In an email sent on October 12, 2016, counsel for SBA followed up with the BCP front office and, once more, explained why the robocall prohibition did not apply to soundboard calls.  The October 12 email was forwarded to FTC staff involved in deciding whether to subject soundboard technology to the robocall prohibition.

54.     SBA and PACE anticipated additional discussions with FTC staff, but heard nothing more from the FTC until November 9, 2016, when FTC staff called counsel for SBA to explain that the FTC was going to subject soundboard technology to the robocall prohibition.

55.     The culmination of SBA's and others' engagement with the FTC on the soundboard technology question was the November 10 letter, which provides that "calls made using soundboard technology are subject to the provisions of [the robocall prohibition]."

56.     Like the September 2016 draft letter, the November 10 letter is premised on inaccuracies and omissions about soundboard technology.

57.     The November 10 letter is, by its terms, legally binding.  In particular, it states that:

> In order to give industry sufficient time to make any necessary changes to bring themselves into compliance, the revocation of the September 2009

letter will be effective six months from today. As of that date, the
September 11, 2009 letter will no longer represent the opinions of FTC
staff and cannot be used, relied upon, or cited for any purpose.

58. Although the November 10 letter states that the views it expresses "are those of
the FTC staff," and "have not been approved or adopted by the Commission, and [] are not
binding upon the Commission," it concludes by stating that the views expressed in it "do reflect
the views of staff members charged with enforcement of the TSR."

## V.  The Consequences of the November 10 Letter To SBA Members

59. On information and belief, despite the disclaimer in the November 10 letter that it
expressed only the views of FTC staff and is not binding on the Commission, the November 10
letter was reviewed and its publication approved by each Commissioner.

60. Regardless, the disclaimer is boilerplate and it can hardly be doubted that the
November 10 letter — from the "staff members charged with enforcement of the TSR" —
amounts to a practically binding amendment to the TSR's robocall prohibition, inasmuch as the
November 10 letter tells affected "industry" stakeholders in no uncertain terms that they have six
months "to make any necessary changes to bring themselves into compliance."

61. The November 10 letter is an enforcement ultimatum to call centers and other
sellers or telemarketing companies that use soundboard technology: Stop using soundboard
altogether for telemarketing sales calls or face enforcement consequences under the TSR for
violations of the robocall prohibition. As it relates to these entities, the robocall prohibition —
which has never before been applied to them — now applies in full.

62. Some SBA member companies also conduct fundraising campaigns on behalf of
charitable organizations. The term charitable organization is not defined in the TSR but
generally includes a variety of organizations speaking to charitable, religious, educational, social,
and political causes. The prohibition on soundboard calls made on behalf of charitable

organizations to prospective members or donors interferes with their freedom of speech and restricts advocacy on important social, economic, and political issues, as well as religious proselytization and anonymous political speech.   More specifically, the November 10 letter abridges speech protected by the First Amendment to the United States Constitution by effectively banning certain kinds of charitable or advocacy calls made using soundboard technology based on their content — *i.e.*, calls requesting support from prospective members or first-time donors are prohibited but calls requesting support from members or prior donors are permissible.

63.    These effects of the November 10 letter will be devastating for SBA's member companies, which will have to lay off many of their employees or, in many cases, cease operating altogether.

## COUNT I

### (The November 10 Letter Violates the APA)

64.    Paragraphs 1–63 are incorporated by reference.

65.    The November 10 letter substantively amends the TSR robocall prohibition by expanding it to prohibit the use of soundboard technology by call centers and other telemarketing companies in their use of the technology for sales calls.   Now on notice that it must stop using soundboard technology for sales calls as of May 12, 2017, the affected industry has no choice but to comply with the edict or face enforcement consequences.   As a practical matter, therefore, the affected industry is bound by the November 10 letter.   The November 10 letter thus constitutes a legislative rule.

66.    The Telemarketing Act directs the FTC to adhere to the APA in promulgating regulations to implement the TSR.   The APA in turn requires that, before an agency promulgates a legislative rule, it must provide the public with notice of, and the opportunity to comment on,

the rule in question.  5 U.S.C. § 553(b).

67.     The FTC issued the November 10 letter without first providing the public with

notice of the proposal and the opportunity to comment on it.

68.     Because the November 10 letter is a legislative rule, and because the FTC did not

comply with the APA's notice-and-comment rulemaking requirements when promulgating it, the

letter is invalid and unenforceable.

## COUNT II

### (The November 10 Letter Violates the First Amendment)

69.     Paragraphs 1–68 are incorporated by reference.

70.     The November 10 letter, insofar as it amends (by expanding) the TSR robocall

prohibition, draws unconstitutional distinctions between different kinds of speech by SBA

member companies made on behalf of charitable and other nonprofit advocacy organizations

based on the content of the message conveyed in violation of the speaker's constitutional right to

free speech.  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015); *Turner Broad. Sys. v. FCC*,

512 U.S. 622, 658 (1994).

71.     The terms of the November 10 letter leave affected industry with no choice but to

comply with the new rule or face enforcement consequences. Affected industry is thus

practically bound by the November 10 letter.

72.     The APA requires courts to set aside decisions of a federal agency where they are

contrary to a constitutional right.  5 U.S.C. 706(2)(A)–(C).

73.     A content-based restriction on protected speech is subject to strict First

Amendment scrutiny.  *Riley v. Nat'l Fed'n of Blind, Inc.*, 487 U.S. 781, 789 (1988).  Even time,

place and manner restrictions, if content-based, are subject to strict scrutiny.  *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 791 (1989).

74.     The November 10 letter is content-based because it treats speech tailored for first-time donors differently than speech tailored for previous donors.

75.     The November 10 letter is not narrowly tailored to further any conceivable government interest.

76.     Numerous less restrictive alternatives are available to the FTC in regulating abusive telemarketing practices.

77.     Further, the November 10 letter is substantially overbroad because it restricts more speech — *i.e.*, soundboard calls to prospective members or donors of advocacy organizations — than is required to further any conceivable government interest.

78.     Finally, the November 10 letter is unconstitutionally vague.

79.     Because the November 10 letter violates the First Amendment rights of SBA member companies making calls on behalf of charitable and other nonprofit advocacy organizations, it is invalid and unenforceable.

## COUNT III

### (Declaratory Judgment)

80.     Paragraphs 1–79 are incorporated by reference.

81.     The Declaratory Judgment Act, 28 U.S.C. § 2201, grants this Court authority to declare SBA's legal rights (and those of its members) where an actual controversy exists.

82.     As stated above, an actual controversy exists between the SBA and the FTC concerning the validity of the November 10 letter to the extent the letter informs affected parties that telemarketing sales calls made using soundboard technology are subject to the robocall prohibition of the TSR effective May 12, 2017.

83.     This Court therefore has power to declare that, in promulgating the November 10 letter, the FTC violated the APA, 5 U.S.C. § 553(b).

## PRAYER FOR RELIEF

SBA respectfully asks that this Court:

a.       Declare that the FTC violated the Telemarketing Act and the APA in issuing the November 10 letter without first subjecting its new rule, that soundboard calls are prohibited robocalls, to notice-and-comment rulemaking;

b.       Declare that the FTC's November 10 letter prohibiting soundboard calls violates the First Amendment by restricting the protected speech of SBA member companies that make calls on behalf of charitable and other nonprofit advocacy organizations; and

c.       Vacate the November 10 letter as null and void;

d.       Enjoin the FTC from taking or threatening enforcement action under the TSR on the ground that an outbound telephone call utilizing soundboard constitutes a telephone call that "delivers a prerecorded message" within the meaning of 16 C.F.R. § 310.4(b)(1)(v) as that regulation currently exists;

e.       Award SBA its fees and costs related to this action; and

f.       Grant such additional relief as the Court deems just and proper.

Respectfully submitted,

January 23, 2017

*/s/ Daniel W. Wolff*
Daniel W. Wolff (D.C. Bar No. 486733)
       dwolff@crowell.com
Peter B. Miller
Mark R. Thomson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2595
Phone: 202-624-2500
Fax: 202-628-5116

*Attorneys for Plaintiff*
*Soundboard Association*