**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUNDBOARD ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:17-cv-00150-APM |
| v. | ) |
| | ) |
| UNITED STATES FEDERAL TRADE | ) |
| COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**REPLY IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR PRELIMINARY INJUNCTION**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................i

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I. SBA IS LIKELY TO SUCCEED ON THE MERITS ...................................... 3

     A. The November 10 Letter Violates the APA. ........................................ 3

         1. The November 10 letter is "final." ........................................ 3

         2. The November 10 letter is a legislative rule. ...................... 12

     B. The November 10 Letter Violates SBA Members' First Amendment Rights ................................................................................................... 16

         1. The robocall prohibition as applied to SBA by the November 10 letter is facially content-based ........................ 17

         2. Even if facially content-neutral, the robocall prohibition cannot be justified without reference to the content of the speech ................................................................................... 19

         3. The robocall prohibition fails strict scrutiny ...................... 20

II. SBA MEMBER COMPANIES FACE IRREPARABLE HARM .................... 21

III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES SUPPORT ENTRY OF AN INJUNCTION. ..................................................................... 24

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

(Authorities principally relied upon are marked with a *)

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)....................................................................................5, 11

*Amoco Prod. Co. v. Watson*,
  410 F.3d 722 (D.C. Cir. 2005) .................................................................9

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ...................................................1, 10, 12

*Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016).................................................................8, 9

*AT&T Corp. v. F.C.C.*,
  841 F.3d 1047 (D.C. Cir. 2016) ...............................................................13

*Beacon Theatres, Inc. v. Westover*,
  359 U.S. 500 (1959)...........................................................................21

*Bennett v. Spear*,
  520 U.S. 154 (1997)...........................................................................3

*Brickman v. Facebook, Inc.*,
  No. 16-cv-00751, 2017 WL 386238 (N.D. Cal. Jan. 27, 2017).............................18

*Cahaly v. Larosa*,
  796 F.3d 399 (4th Cir. 2015) ...................................................18, 19, 20

*Carey v. Brown*,
  447 U.S. 455 (1980)..........................................................................17

*Cement Kiln Recycling Coal. v. EPA*,
  493 F.3d 207 (D.C. Cir. 2007)...............................................................4

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
  452 F.3d 798 (2006).........................................................................11

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000)..........................................................................13

*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012).......................................................................16

*Ciba-Geigy Corp. v. EPA,*
    801 F.2d 430 (D.C. Cir. 1986) ............................................................3, 4

*Cmty. Nutrition Inst. v. Young,*
    818 F.2d 943 (D.C. Cir. 1987) .................................................................13

*Croplife Am. v. EPA,*
    329 F.3d 876 (D.C. Cir. 2003) ..................................................................6

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.,*
    637 F.3d 408 (D.C. Cir. 2011) .........................................................3, 4, 10

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
    710 F.2d 842 (D.C. Cir. 1983) .................................................................12

*Frozen Food Express v. United States,*
    351 U.S. 40 (1956) .........................................................................6, 9, 11

*FTC v. Standard Oil Co. of California,*
    449 U.S. 232 (1980) ................................................................................10

*Gardner v. Toilet Goods Ass'n,*
    387 U.S. 167 (1967) ................................................................................21

*Gen. Elec. Corp. v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002) ........................................................6, 10, 25

*Gresham v. Rutledge,*
    --- F.3d ---, No. 4:16-cv-00241, 2016 WL 4027901
    (E.D. Ark. July 27, 2016) ...........................................................18, 19, 20

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ..................................................................................8

*Her Majesty the Queen in Right of Ontario v. EPA,*
    912 F.2d 1525 (D.C. Cir. 1990) .................................................................7

*Indep. Equip. Dealers Ass'n v. EPA,*
    372 F.3d 420 (D.C. Cir. 2004) ...............................................................8, 9

*Indep. Petroleum Ass'n of Am. v. Babbitt,*
    92 F.3d 1248 (D.C. Cir. 1996) ..................................................................9

*Iowa League of Cities v. EPA,*
    711 F.3d 844 (8th Cir. 2013) ...................................................................25

*McCullen v. Coakley,*
    134 S. Ct. 2518 (2014) .......................................................................17, 20

*McLouth Steel Prods. Corp. v. Thomas,
    838 F.2d 1317 (D.C. Cir. 1988)..................................................................13

Nat'l Whistleblower Ctr. v. Nuclear Reg. Comm'n,
    208 F.3d 256 (D.C. Cir. 2000)....................................................................15

Nat. Res. Def. Council, Inc. v. Thomas,
    845 F.2d 1088 (D.C. Cir. 1988)....................................................................7

Nat. Res. Def. Council v. EPA,
    643 F.3d 311 (D.C. Cir. 2011)...............................................12, 13, 15, 25

Patriotic Veterans, Inc. v. Zoeller,
    845 F.3d 303 (7th Cir. 2017).....................................................................19

Perez v. Mortgage Bankers Ass'n,
    135 S. Ct. 1199 (2015)..........................................................................13, 15

Reckitt Benckiser, Inc. v. EPA,
    613 F.3d 1131 (D.C. Cir. 2010)...................................................................3

*Reed v. Town of Gilbert,
    135 S. Ct. 2218 (2015)...................................................................18, 19, 20

Reliable Automatic Sprinkler Co. v. CPSC,
    324 F.3d 726 (D.C. Cir. 2003)...................................................................10

Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,
    487 U.S. 781 (1988)....................................................................................20

Safari Club Int'l v. Jewell,
    842 F.3d 1280 (D.C. Cir. 2016)................................................................11

Sierra Club v. Slater,
    120 F.3d 623 (6th Cir. 1997)....................................................................16

Spannaus v. U.S. Dep't of Justice,
    824 F.2d 52 (D.C. Cir. 1987).....................................................................16

Turner Broad. Sys. v. FCC,
    512 U.S. 622 (1994)....................................................................................20

U.S. Telecom Ass'n v. F.C.C.,
    400 F.3d 29 (D.C. Cir. 2005).....................................................................13

Ward v. Rock Against Racism,
    491 U.S. 781 (1989)....................................................................................20

**Statutes**

5 U.S.C. § 551(4) .................................................................................................................12

5 U.S.C. §§ 601–612 .............................................................................................................23

28 U.S.C. § 2401(a) ...............................................................................................................16

**Rules and Regulations**

16 C.F.R. § 1.98 .......................................................................................................................8

Local Civil Rule 65.1(d) ........................................................................................................23

**Miscellaneous**

*Division of Marketing Practices*, FTC.GOV, https://www.ftc.gov/about-
    ftc/bureaus-offices/bureau-consumer-protection/our-divisions/division-
    marketing-practices (last visited February 23, 2017) ..............................................3

Lois Greisman, *Prepared Statement of The Federal Trade Commission Before the
    Senate Special Committee on Aging on Stopping Senior Scams: Developments
    in Financial Fraud Affecting Seniors*, at 5–6 (February 15, 2017), *available at*
    www.ftc.gov/system/files/documents/public_statements/1069573/p134405_
    commission_testimony_re _stopping_senior_scams_senate_02152017.pdf...........................8

Profile of Lois C. Greisman, FTC.GOV, *available at* https://www.ftc.gov/about-
    ftc/biographies/lois-c-greisman (last visited Feb. 23, 2017)....................................8

## <u>INTRODUCTION</u>

In *every* case where an agency purports to act informally through "guidance," "opinion letter," or some similar formulation and gets called out for having, as a practical matter, announced a legislative rule, one thing is guaranteed: the agency will vehemently deny that its action constitutes a legislative rule. So it is with the FTC in this case. But the FTC, as with other agencies that have acted similarly and been called out for it, is wrong.

The nature of the FTC action about which SBA complains in this lawsuit was presaged by the D.C. Circuit in *Appalachian Power* where, addressing the prolific use of guidance by agencies to accomplish substantive changes in the law, it said:

> An agency operating in this way gains a large advantage. It can issue or amend its real rules, i.e., its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures. The agency may also think there is another advantage—immunizing its lawmaking from judicial review.

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (internal citation and quotation marks omitted).

Following the government's litigation playbook, the FTC here objects to SBA's Administrative Procedure Act (APA) claim on grounds that the FTC's newly expanded robocall prohibition (1) does not constitute "final agency action"; (2) is not a "rule" because it is not binding on the Commission; and, at the very least, (3) is not a legislative rule because it is only an interpretation of existing regulations. This being the canonical response, courts in this Circuit have seen it before. *See*, *e.g.*, *id.* ("EPA tells us that its Periodic Monitoring Guidance is not subject to judicial review because it is not final, and it is not final because it is not 'binding'").

The FTC is wrong at each step. Its November 10 letter announcing an expanded robocall prohibition is both "final" and a "rule" because it consummated a months-long consideration by the

FTC office responsible for enforcing the Telemarketing Sales Rule (TSR), and it binds SBA member companies to conform to its mandate on pain of civil penalty. And it is "legislative" rather than "interpretative" in character because it substantively expands the reach of the robocall prohibition from unattended, prerecorded calls that permit no variation, to — *for the first time* — telemarketing calls in which a live agent determines the course and content of the communication and interacts with and responds to the call recipient using soundboard technology. The FTC cannot "interpret" its way to that result — if it wants to regulate soundboard, it must promulgate a rule that does so through the normal APA process.

The FTC's November 10 letter also violates the First Amendment. The FTC contends the robocall prohibition as applied to soundboard calls soliciting charitable contributions is a perfectly permissible, content-neutral regulation. It is wrong because it would be impossible for the FTC to pursue enforcement against a telemarketer under that provision without first examining the content of the regulated speech, and the regulation cannot otherwise withstand strict scrutiny.

And while the FTC glibly dismisses SBA's sworn declarations of the irreparable harm the November 10 letter will cause SBA member companies, it then also objects to the Court hearing live testimony on this point, saying the declarations are sufficient. That makes no sense.

Because SBA is likely to succeed on the merits of both its APA and First Amendment claims; because SBA member companies will face irreparable harm if the Court does not enjoin the effect of the November 10 letter pending resolution of this matter on the merits; and because the public interest and balance of the equities tilt strongly in favor of SBA, this Court should grant the requested preliminary injunction.

## ARGUMENT

### I.    SBA IS LIKELY TO SUCCEED ON THE MERITS

####    A.    The November 10 Letter Violates the APA.

#####       1.    The November 10 letter is "final."

The November 10 letter is reviewable because it is "final." An agency action is final when it marks "the 'consummation' of the agency's decisionmaking process," as opposed to being "of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The action must also determine rights or obligations, or be one "from which legal consequences will flow." *Id.* Applying that standard in cases similar to this one, the D.C. Circuit has repeatedly emphasized three considerations: (1) whether the agency has taken a "definitive" legal position about the scope of its authority; (2) whether the case presents "a purely legal" question of interpretation; and (3) whether the agency's action imposes "an immediate and significant practical burden" on regulated parties. *See CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 478 (D.C. Cir. 2011); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986); *see also Reckitt Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1137 (D.C. Cir. 2010) (describing *Ciba-Geigy* as "complementary" to *Bennett*). Under that test, the November 10 letter is final action.

First, the November 10 letter is a "definitive" statement of the FTC's legal position. The letter was issued by the Division of Marketing Practices (DMP), the FTC component that "issues, revises, and enforces . . . [t]he Telemarketing Sales Rule,"[1] following months of consideration that included soundboard industry representatives meeting with DMP staff, DMP head Lois Greisman, and the then-Director of the FTC's Bureau of Consumer Protection. The

---

[1]  *See Division of Marketing Practices*, FTC.GOV, https://www.ftc.gov/about-ftc/bureaus-offices/bureau-consumer-protection/our-divisions/division-marketing-practices (last visited February 23, 2017).

November 10 letter, signed by Ms. Greisman (who also signed the 2009 letter), was the culmination of that process, documenting the FTC's "conclusion" that "calls made using soundboard technology *are* subject to the [robocall prohibition]," and "*can only* be made legally" in a narrow set of circumstances. *See* DE 1-2, at 4 (emphasis added). The November 10 letter is so resolute about the enforceability of its newly announced compliance obligations that it sets a firm deadline by which industry members must "bring themselves into compliance" with the FTC's reversal in position prohibiting soundboard use. *Id.* at 5. The history and substance of the November 10 letter demonstrate the definiteness of the FTC's legal position.

Second, this case presents a "purely legal" question of regulatory interpretation: Does the robocall prohibition encompass soundboard? Because there are no disputed facts bearing on that question, review of the FTC's legal position would not "benefit from a more concrete setting." *Ciba-Geigy*, 801 F.2d at 435; *see also Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007).

Third, the November 10 letter imposes immediate and significant practical burdens on SBA and its members. The letter bans outbound telemarketing calls using soundboard and threatens that SBA's members will be subject to enforcement actions if they persist in using soundboard as they have done for years. At a minimum, this casts a cloud of uncertainty over the viability of SBA's members' ongoing business operations. *See CSI Aviation*, 637 F.3d at 412. It also puts SBA's members to a painful choice between business-shuttering compliance and the risk of ruinous enforcement actions in the future — a conundrum that is "the very dilemma [the Supreme Court has found] sufficient to warrant judicial review." *Ciba-Geigy*, 801 F.2d at 439. "Having thus flexed its regulatory muscle, [the FTC] cannot now evade judicial review." *CSI Aviation*, 637 F.3d at 413.

The FTC's counterarguments about finality are unavailing, resting principally on the notion that the staff that sent the letter lacks formal authority to bind the Commission. But the FTC sets its sights on the wrong target.

For APA finality purposes, the question is whether the FTC has consummated its decision-making with regard to whether soundboard calls will be treated as "prerecorded calls" *subject to* the robocall prohibition. The FTC division that "issues, revises, and enforces" the TSR has stated, after months of consideration, that it *will* treat soundboard calls as prerecorded calls. *See* Doc. 1-2 at 4–5. That the FTC might hypothetically not act on DMP's recommendation to take enforcement against prohibited soundboard use in any particular case (which would be odd, given that the FTC tells the Court that it "vigorously enforces" the TSR's robocall prohibition, *see* FTC Br. 6) is beside the point. Not only does the possibility of escaping *enforcement* down the road not give comfort to SBA member companies that must decide now to come "into compliance" or risk serious enforcement consequences, FTC *enforcement* is not the issue; the issue is the FTC's decision to *treat soundboard calls as prohibited robocalls*. The November 10 letter's command to SBA member companies (and others similarly situated) to come "into compliance" means, of course, that if SBA members do not do what the staff is directing them to do in the November 10 letter, they will be presumed to be out of compliance, *i.e.*, acting illegally, and *subject to* FTC enforcement solely and specifically for using soundboard. That is the entire point of the November 10 letter. There is nothing "tentative" about the letter and no ambiguity as to what the FTC is seeking to accomplish by issuing it. A pronouncement that warns the regulated community that certain acts are *subject to* severe enforcement consequences, and that regulated parties that act out of step with the pronouncement do so at their own risk, is final agency action, notwithstanding the fact that enforcement might never come. *See Abbott*

*Labs. v. Gardner*, 387 U.S. 136, 140, 150 (1967); *Frozen Food Express v. United States*, 351 U.S. 40, 44–45 (1956); *see also* P.I. Memo at 31.

Even taken on its own terms, the FTC's argument is wrong. Although an agency action that binds itself to a position is *a* test of whether a pronouncement creates a binding norm, it is not *the* test. *See Croplife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (emphasizing the unifying theme to D.C. Circuit precedent in this area: "whether the agency action binds private parties *or* the agency itself with the 'force of law'") (*citing Gen. Elec. Corp. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)) (emphasis added). In *Croplife*, the D.C. Circuit stressed that "*General Electric* and other cases also make it clear that the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise." *Id.* Thus, the Court must look at the November 10 letter for what it is — in particular, for what it tells the regulated parties — not for what the FTC tells the Court it is for purposes of escaping review. As explained below at pages 12–16, the November 10 letter is a legislative rule not because it was published by the official mouthpiece of the FTC, but because it is binding in effect on the private parties the TSR regulates. After all, notwithstanding the FTC's smokescreen, DMP — which issued the letter — is, as the letter itself states, the one "charged with enforcement of the TSR," and the letter gives the regulated companies a deadline by which to "bring themselves into compliance" or risk enforcement. Doc. 1-2 at 5.

The FTC's position elevates form over substance. What would be left of the APA, especially notice-and-comment rulemaking and judicial review, if agencies could avoid it merely by assigning the power to creatively reinterpret substantive regulations to subordinate agency units? After all, as the FTC stresses, it is the FTC sitting as the Commission that was authorized

by Congress to develop rules implementing the Telemarketing Act's prohibition on abusive telephone sales practices. And so it was the FTC sitting as the Commission that promulgated the TSR and its amendments, including the 2008 robocall prohibition. If the FTC wants to revisit the scope of that prohibition, then it alone is accountable for any changes made. The FTC does not deny that the FTC Commissioners were provided a copy of the letter. *See* FTC Br. 17 n.17. How convenient for the FTC if it could get away with a *sub rosa* wink and a nod from the FTC *qua* Commission tacitly approving a new policy while avoiding review because the policy is announced over the signature of a subordinate.[2] That a hit man is sent to perform the crime does not allow the principal to avoid the time. And so it is, also, in administrative law: agencies cannot escape judicial review for their actions merely by using subordinates to announce new substantive policies. *See*, *e.g.*, *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531–32 (D.C. Cir. 1990) (rejecting agency argument that, because views expressed in statement were merely those "of a subordinate agency official," they "[could not] be considered final action by the EPA administrator"); *Nat. Res. Def. Council, Inc. v. Thomas*, 845 F.2d 1088, 1094 (D.C. Cir. 1988) (subordinate agency officials' pronouncements qualified as final agency action).

In any event, there is little reason to doubt that the Commission would act on a DMP recommendation to enforce the expanded robocall prohibition against soundboard calls — particularly since the FTC "vigorously enforces" the TSR. FTC Br. 6. What would be the point of delegating enforcement responsibility to a dedicated professional staff[3] other than to vest in

---

[2] The FTC states SBA had no right to rely on the September 2009 letter and cannot be heard to complain about the agency's about-face now. FTC Br. 20. The argument distorts SBA's argument. SBA relied on the regulation itself, which the September 2009 letter merely confirmed. *See* PI Memo 11.

[3] And just to be clear, the FTC signatory of the November 10 and September 2009 letters is no mere bureaucrat of low rank. Ms. Greisman, a career Senior Executive Service appointee and (Continued...)

that office, as a practical matter, the authority to determine enforcement policy and act consistently with that policy? But even to the extent the FTC *qua* Commission may exercise prosecutorial discretion not to act, *see* P.I. Memo 19 (citing *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)), that does not mean the November 10 pronouncement is not actionable as final agency action. *See Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) ("As we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'").[4]

The FTC's reliance on *Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004), is perplexing. There, the D.C. Circuit considered whether a letter that merely *restated* "EPA's established interpretation . . . tread no new ground" and "left the world just as it found it" was reviewable agency action. *See id.* at 428. The Court of Appeals, of course, said no.

> The answer seems obvious once we examine the concrete impact the EPA Letter had on IEDA and its members — in short, none whatsoever…. [It] merely restated in an abstract setting — for the umpteenth time — EPA's longstanding interpretation . . . . The Letter neither announced a new interpretation of the regulations nor effected a change in the regulations themselves. The Letter was purely informational in nature; it imposed no obligations and denied no relief. Compelling no one to do anything, the letter had no binding effect whatsoever — not on the agency and not on the regulated community.

_____

long-time head of DMP, is a veteran of more than 20 years at the FTC, who has, among other things, testified numerous times to Congress on behalf of the FTC about TSR and robocall policy and enforcement activities. *See* Lois Greisman biography, FTC.GOV, *available at* https://www.ftc.gov/about-ftc/biographies/lois-c-greisman (last visited Feb. 23, 2017).

[4] Anyone who violates the TSR is subject to civil penalties of up to $40,000 per violation. 16 C.F.R. § 1.98. The Commission's "45 cases against 163 companies and 121 individuals responsible for billions of illegal robocalls, as well as numerous Do-Not-Call violations" have thus far yielded "judgments totaling more than $500 million in civil penalties, redress, or disgorgement, with $29 million in collected judgments." Lois Greisman, *Prepared Statement of The Federal Trade Commission Before the Senate Special Committee on Aging on Stopping Senior Scams: Developments in Financial Fraud Affecting Seniors*, at 5–6 (February 15, 2017), *available at* www.ftc.gov/system/files/documents/public_statements/1069573/p134405_commission_testimony_re _stopping_senior_scams_senate_02152017.pdf.

*Id.* at 427. There is no comparison to be made to the FTC's letter at issue here. Two other decisions cited by the FTC are similarly inapposite. *See* DE 11 at 31 (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1256–57 (D.C. Cir. 1996), and *Amoco Prod. Co. v. Watson*, 410 F.3d 722, 732 (D.C. Cir. 2005)). While the FTC cites those cases for the point that "workaday" advisory letters are not binding on the agency, that only matters (to the extent it ever matters) if the subject letter is in fact a *workaday* letter lacking any "future effect," as they were in those cases. *See Babbitt*, 92 F.3d at 1256; *Watson*, 410 F.3d at 732.

Here, the target of SBA's complaint is not by any stretch a workaday letter. The November 10 letter most definitely has "future effect" and binds SBA member companies in a practical sense: if they do not "come into compliance," they risk substantial penalties. The November 10 letter thus resembles the order at issue in *Frozen Food Express*, which, despite being merely the agency's *interpretation* of the relevant statute, was deemed "immediately reviewable" because it "warn[ed]" the regulated community that anyone who continued to operate in a manner contrary to the agency interpretation did so "at the risk of incurring criminal penalties." *Hawkes Co.*, 136 S. Ct. at 1815 (Roberts, C.J.) (explaining *Frozen Food Express*). As did the order in *Frozen Food Express*, the November 10 letter warns businesses that do not fit within its strictures that, by continuing to engage in an established practice, they will be at risk of substantial penalties. *See Frozen Food Express*, 351 U.S. at 43–44. The November 10 letter is every bit as final as the pronouncement in *Frozen Food Express*.

The FTC similarly misses the mark when it argues that the November 10 letter is not final because the Commissioners might reject or revise its terms in the future. DE 11 at 29. "[I]f the possibility . . . of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of

law." *Gen. Elec.*, 290 F.3d at 380; *see also Appalachian Power*, 208 F.3d at 1022 ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."). What matters is that, right now, the FTC office responsible for enforcing the TSR has definitively stated that soundboard calls will be regarded as prerecorded messages prohibited under the TSR. That is practically binding on SBA member companies *now*.

The FTC relies on *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980), to argue that final agency action in a case like this one requires the completion of a full enforcement action. The D.C. Circuit, however, has rejected *exactly* that argument. *See CSI Aviation*, 637 F.3d at 413–14 (explaining, in a case similar to this one, that "*Standard Oil* differs from the present case in three key respects"). This Court should do likewise.

The same is true of the FTC's misplaced reliance on *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726 (D.C. Cir. 2003). As the *CSI Aviation* Court explained:

> In *Reliable Automatic Sprinkler* . . . we found a lack of finality where the Commission sent a letter informing a sprinkler company that it "intended to make a preliminary determination that the [company's] sprinkler heads present[ed] a 'substantial product hazard.'" That case is inapposite here because it lacked two key factors for reviewability. First, the letter was not definitive because the Commission had "yet to determine its jurisdiction to regulate; [] yet to determine whether the sprinkler heads present[ed] a 'substantial product hazard'; and yet to issue any compliance orders." And, equally important, the question at issue there, whether sprinkler heads qualified as "consumer products" under the Consumer Product Safety Act, "clearly involve[d] the resolution of factual issues and the creation of a record," as well as the exercise of "agency expertise" prior to court involvement.

637 F.3d at 416 n.2 (citations omitted). The two finality factors that the *CSI Aviation* court said were missing in *Reliable Automatic Sprinkler* — (i) definiteness in the agency's position and (ii) the absence of any underlying factual disputes — are present here. The FTC has directed soundboard users to "bring themselves into compliance" by a specific date under pain of hefty enforcement, and the Court would gain nothing from the development of additional facts.

The other case on which the FTC relies heavily is *Center for Auto Safety v. National Highway Traffic Safety Administration*, 452 F.3d 798 (2006), but that case cannot bear the weight the FTC places upon it. It concerned guidance from an associate administrator at the National Highway Traffic Safety Administration (NHTSA) regarding the procedures required for voluntary recalls of certain vehicles. As the D.C. Circuit emphasized at great length, the guidance at issue in *Center for Auto Safety* "read as *guidelines*, not binding regulations." *Id.* at 809 (emphasis in original). The guidance language at issue in that case was, as the Court pointed out at some length, conditional and qualifier-laden, *see id.* — a far cry from the absolute and definitive text of the FTC's November 10 letter. Whereas the NHTSA's guidance "ha[d] not commanded, required, ordered, or dictated" any specific action, *id.*, the November 10 letter does exactly those things. And whereas the NHTSA's guidance merely presented regulated entities with the option of voluntarily complying with what NHTSA deemed best practices, the November 10 letter is an ultimatum: as was true of the regulated entities in *Frozen Food Express*, SBA's members must cease longstanding industry practices or risk enforcement.

Common to all of the FTC's finality arguments is an insistence on a cramped and formalistic approach to finality — of exactly the sort that the Supreme Court and the D.C. Circuit have consistently eschewed. *See, e.g.*, *Abbott Labs.*, 387 U.S. at 149 ("The cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way."); *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) ("The finality inquiry is a pragmatic and flexible one.") (quotation marks omitted). The Court, says the FTC, must ignore the November 10 letter's real-world consequences and plain language because all that matters for purposes of finality is the nominal legal form of agency action and the title of its author. Neither precedent nor common sense supports that view, and this Court should decline the FTC's

invitation to transform what has always been a flexible and pragmatic inquiry into one that turns

on mechanical criteria that agencies routinely invoke self-servingly when seeking to prevent

judicial review of actions directly affecting the conduct of regulated parties. *See Appalachian*

*Power*, 208 F.3d at 1020. Because the November 10 letter bears all the hallmarks of finality for

which the D.C. Circuit has traditionally looked, it is reviewable.

### 2.    The November 10 letter is a legislative rule.

The FTC argues that, finality aside, the November 10 letter was not a "rule" or, at most,

was merely an "interpretative" rule not required to go through notice-and-comment rulemaking.

Both arguments are wrong. SBA addresses them together.

The Court should reject the FTC's argument that the November 10 letter is not a rule for

the same reason it should reject the FTC's argument that the letter does not constitute final

agency action. *See Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011) (noting

that inquiries into whether agency action is final and whether agency action is a rule are

essentially the same). On this point, the FTC again relies on the fact that the letter was a staff

opinion letter and, as such, amounts only to "guidance" that has no binding effect on the FTC.

Yet, the November 10 letter fits neatly within the APA's definition of "rule,"[5] inasmuch as it

commands the industry to "come into compliance" with the FTC's newly announced position on

the application of the TSR's robocall prohibition to calls made using soundboard.

The FTC thus argues as its fallback the usual agency position that, at most, its letter is an

"interpretative rule" exempt from notice-and-comment rulemaking. But the line between

---

[5] *See* 5 U.S.C. § 551(4) ("rule" means "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy."); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846 (D.C. Cir. 1983) (noting that APA's definition of "rule" is "broad enough to include nearly every statement an agency may make") (quotation marks omitted).

legislative and interpretative rules is not as clear as the FTC portrays it. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (describing the distinction as "tenuous").

All agency pronouncements about an extant rule are inherently "interpretative" to some degree, but the Court's analysis does not end at the label affixed by the agency. *See Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) (recognizing that where an agency interpretation of one of its own regulations is inconsistent with the regulation, the interpretation should not be permitted because it would "create *de facto* a new regulation"); *AT&T Corp. v. F.C.C.*, 841 F.3d 1047, 1049 (D.C. Cir. 2016); *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 38 (D.C. Cir. 2005); *see also McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) (stating an agency's claim that it is not "bound" by a guidance document "is obviously of little weight" in determining whether the guidance is in fact a rule). To avoid APA notice-and-comment requirements, the interpretation must be one that articulates a fair reading of a regulation that is, in the first instance, capable of multiple meanings on the specific issue raised (*i.e.*, is ambiguous on the question posed). *See Nat. Res. Def. Council*, 643 F.3d at 321. If the interpretation goes beyond what the existing regulation covers or permits, it is legislative in nature.[6] *Id.*

The FTC goes on at length about how the November 10 letter fairly provides "interpretative guidance" for industry about the application of the 2008 robocall prohibition to soundboard. FTC Br. 23–27. The FTC cites supposed facts and "consumer complaints" about soundboard technology and then tries to stuff them into the same "prerecorded message" bucket that it proscribed in 2008. At first blush, it all sounds very convincing — after all, who likes a

---

[6] The Supreme Court's reiteration in *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015), that a new interpretation is no less permissible (if reasonable) than a prior inconsistent interpretation does not speak to the Court's analysis in this case because, in *Mortgage Bankers*, the plaintiff did not challenge the new interpretation at issue as a legislative rule. *See id.* at 1210.

robocall? Even the name sounds ominous. But the FTC's brief suffers from the same fatal defect as the November 10 letter, which is that the purported numerous consumer complaints relied upon by the FTC and prompting the November 10 letter are all of recent vintage. *See* FTC Br. 11; Bandy Decl., Doc. 11-1 ¶ 5 (describing complaints to the FTC since 2009 that prompted the FTC to adopt a new position on soundboard technology). That is the problem: none of this newfound data has been subject to public scrutiny and comment, notwithstanding the FTC's reliance on this data to expand the reach of the robocall prohibition to include interactive calls made by a live agent who uses soundboard to respond appropriately to call recipients.

The FTC chides SBA for "devot[ing] approximately 10 pages to challenging the letter's analysis of the *facts* of the soundboard industry," FTC Br. 27, but that misses the point. As SBA explained, it presented the counterpoint to the FTC's position on the merits of soundboard only for the purpose of demonstrating why notice-and-comment rulemaking was required. *See* P.I. Memo 25 ("[R]egardless of whether the FTC got it wrong or right, if the FTC disagrees with the policy position of the SBA . . . *the law* does not allow it to simply impose by fiat a new rule prohibiting the use of that technology.").

Maybe the FTC's argument that soundboard contributes to the scourge of robocalls would carry the day if the FTC were defending a duly promulgated rule prohibiting the use of soundboard for outbound telemarketing calls. Then again, maybe it would not; or maybe the rule would not have been promulgated identically in the first instance. *See id.* 24–29. SBA's point is not to persuade this Court to vacate the November 10 letter as arbitrary and capricious; the point is that these are issues that the FTC is obligated to grapple with as part of a rulemaking. *See id.* 29–30.

A legislative rule may be thought of as a box of tools and parts. An agency may provide guidance on how it will use the defined tools or assemble the defined parts, but it may not — in the guise of *interpretation* or otherwise — expand or shrink the box to add or subtract new tools or parts. If it does that, it is engaging in rulemaking, and it must follow rulemaking procedures. *See Nat. Res. Def. Council*, 643 F.3d at 321. With the November 10 letter, the FTC has improperly expanded the robocall prohibition box.

This is thus not a case where the agency interpretation goes to procedural rights, where a newer, less generous interpretation might make life a little more difficult for the regulated community, but does nothing to affect its substantive rights. *See, e.g.*, *Nat'l Whistleblower Ctr. v. Nuclear Reg. Comm'n*, 208 F.3d 256, 262–63 (D.C. Cir. 2000). Nor is this even a case such as in *Mortgage Bankers*, concerning the Department of Labor's multiple flip flops over the years on the question of whether mortgage loan officers qualified under the regulatory test for exemption from overtime pay. *See Mortg. Bankers*, 135 S. Ct. at 1204–05. Here, in stark contrast, the correctness of the agency's so-called interpretation goes directly to substantive rights and obligations – it puts company and individual livelihoods at stake immediately because it means the difference between SBA companies being allowed do what they do, or severely curtailing their operations or shutting down altogether. *See* Doc. 4-3 ¶ 33; Doc. 4-4 ¶ 11.

The practical reality of the November 10 letter is that a large portion of the business services that SBA member companies provide will now be prohibited. Because that type of agency action is substantive in effect and has legal ramifications for SBA's members, it is the sort of rule — a legislative rule — that can be announced, if at all, only by way of notice-and-comment rulemaking.

Finally, the timing of the FTC's newly announced position bears noting because it has serious collateral consequences that this Court should consider. Any challenge the industry could have made to the merits of the 2008 TSR robocall prohibition under the APA would have been subject to the general six-year limitations period for suits against the United States. *See* 28 U.S.C. § 2401(a); *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997). Had the FTC shown any ambivalence about the scope of the robocall prohibition in its September 2009 letter or at any other time within the six-year window that industry had to challenge the 2008 TSR amendments, industry could have taken its case to court. Here, it would be patently unfair for the FTC to dodge judicial review because its staff, without rulemaking authority, "interpreted" the robocall prohibition with fresh eyes to say something different, nine years after it was promulgated, beyond the scope of the statute of limitations. The Court should be satisfied that the FTC's long period of taking no enforcement action against soundboard calls under the robocall prohibition signals that soundboard calls are not within the scope of that provision. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012).

**B.      The November 10 Letter Violates SBA Members' First Amendment Rights.**

Like its APA argument, the FTC's First Amendment argument falls flat. As an initial matter, the FTC contends that SBA's First Amendment claim is time-barred because it attacks the 2008 TSR amendment giving rise to the robocall prohibition. But, as the FTC acknowledges, the TSR's robocall prohibition did not apply to soundboard calls before now, so it is only with the publication of the November 10 letter that SBA's cause of action accrued. *See Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56 (D.C. Cir. 1987).

Turning to the substance of the FTC's arguments, under no measure may the newly expanded robocall prohibition be justified without reference to the content of the message. In fact, the FTC's attempt to argue lack of irreparable harm (an argument with which SBA disposes

below) ironically *emphasizes* the content-based nature of its letter by describing the *substance* (not the time, place, or manner) of "other" soundboard uses unaffected by the TSR. *See* FTC Br. 38 ("informational" calls, "political" calls, and "healthcare" calls, and "many" charitable calls unaffected). In the face of this, the FTC fails to demonstrate how any of the less restrictive and equally effective privacy protections available to it will not work in order to justify its complete ban on charitable calls to prospective donors that include a request for a charitable contribution. The burden of justifying the speech-restrictive law rests squarely with the government, and the FTC has unequivocally failed to meet its burden.

### 1. The robocall prohibition as applied to SBA by the November 10 letter is facially content-based.

The FTC attempts to couch its speech restriction as being based on the relationship between the audience and the speaker (or the charitable organization and the call recipient). The FTC ignores the fact that its newly announced rule change expressly restricts the content of the message itself, *i.e.*, it limits "what can be said" and not just "when" or "where" something may be said. As explained in *McCullen v. Coakley*, if the restriction necessitates the government's examination of "the content of the message that is conveyed to determine whether a violation has occurred," it is content-based and requires strict scrutiny. 134 S. Ct. 2518, 2531 (2014); *accord Carey v. Brown*, 447 U.S. 455, 462 (1980). Here, it matters both "what SBA members say" on behalf of their clients and "to whom they say it." Indeed, SBA members do not violate the TSR robocall prohibition simply by calling prospective donors or members on behalf of their charitable organization clients. The violation is triggered only if they ask for a first-time, as opposed to a renewal, charitable contribution during such calls.

The November 10 letter's soundboard prohibition singles out a subclass of protected speech for disparate treatment. The content of the message (the request for a charitable

contribution) as well as the type of audience (prospective donors) trigger the ban on charitable fundraising calls. *See Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); *Gresham v. Rutledge*, --- F.3d ---, No. 4:16-cv-00241, 2016 WL 4027901, at *3 (E.D. Ark. July 27, 2016), Unlike consumer calls and charitable calls to prior donors, the FTC affords no relationship-based exemption to calls to prospective donors that include a request for a charitable contribution.

The FTC states that five courts have ruled on the constitutionality of anti-robocall statutes and "[e]very court to have considered the issue has held the regulation to be a content-neutral restriction that turns on the caller's relationship with the consumer . . . ." FTC Br. 29. Not quite. At least three courts, including the Fourth Circuit and two federal district courts, have found anti-robocall statutes to be content-based restrictions that fail strict scrutiny. *See Cahaly,* 796 F.3d at 405 (affirming the lower court's ruling in relevant part); *Gresham*, 2016 WL 4027901, at *1–2.

The FTC also goes wide of the mark in arguing that SBA "mistakenly relies on *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)," saying *Reed* "has no bearing on prior-consent requirements for prerecorded calls." FTC Br. 30. *Reed* controls the content-neutrality question in all cases involving speech restrictions, even if the statute in question is an anti-robocall statute. *See Cahaly,* 796 F.3d at 405; *Gresham*, 2016 WL 4027901, at *1–2; *see also Brickman v. Facebook, Inc.*, No. 16-cv-00751, 2017 WL 386238, at *5–6 (N.D. Cal. Jan. 27, 2017) (TCPA challenge also applying *Reed*). *Reed* similarly controls this case.

Digging in, the FTC seeks to distinguish *Reed* on the ground that the TSR does not "single[] out specific subject matter for differential treatment" and that the FTC did not adopt the ban because "it disapproved any subject matter or viewpoint." FTC Br. 31. But as in *Cahaly*, where consumer and political speech was singled out, the FTC's robocall prohibition singles out *consumer* and *charitable* speech. As for the FTC's motivation, that does not matter. As the Court

said in *Reed* about an innocuous intent and motive:

> A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech. . . . Although a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary. In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.
>
> That is why we have repeatedly considered whether a law is content neutral on its face before turning to the law's justification or purpose.

*Reed*, 135 S. Ct. at 2228.

To the extent "no court has accepted an assertion like SBA's," FTC Br. 31, it is only because the precise question presented by SBA here has not been addressed before. But the constitutional infirmity of the robocall prohibition (as now applied to soundboard) is evident in light of *Reed* and as illustrated by the decisions in the very similar *Cahaly* and *Gresham* cases.

The FTC relies heavily on the Seventh Circuit's recent decision in *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303 (7th Cir. 2017), in which, applying *Reed*, the Seventh Circuit upheld, as content-neutral, Indiana's general requirement of obtaining a call recipient's express consent prior to making pre-recorded message calls and found this consent requirement to be content-neutral. With respect, the *Zoeller* court placed outsized weight on what it viewed as a content-neutral consent requirement and insufficient weight on the content-based exceptions to the prohibition, which by design demonstrated the prohibition itself to be content-based. In any event, in this case, SBA challenges the robocall prohibition as applied (by virtue of the FTC's November 10 letter) to charitable calls to *prospective donors* that *include a request for a charitable contribution*. The content of the speech is thus directly relevant to a telemarketer's ability to comply

> **2.    Even if facially content-neutral, the robocall prohibition cannot be justified without reference to the content of the speech.**

Because application of the robocall prohibition to charitable calls turns on the content of the regulated speech (*i.e.*, the request for a first-time charitable donation), it violates the First Amendment even if the regulation is viewed as facially content-neutral. *See Reed*, 135 S. Ct. at 2227; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). To prove a violation, the FTC would be required to base its case on the content of the targeted speech (*e.g.*, "Would you like to *start* supporting this organization?"). Regardless of how innocuous the FTC's purpose, the statute is content-based under *Reed* and *McCullen*. Strict scrutiny thus applies. *See McCullen*, 134 S. Ct. at 2531; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988); *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).

### 3.    The robocall prohibition fails strict scrutiny.

After assuming for the sake of argument that an interest in protecting consumers from intrusive phone calls was compelling, both the *Gresham* and *Cahaly* courts found that the respective robocall statutes at issue were insufficiently tailored to the government's asserted interest because there were plentiful, less restrictive alternatives available to the government, and the challenged statutes reached more protected speech than necessary. *See Gresham*, 2016 WL 4027901, at *3; *Cahaly*, 796 F.3d at 405–06. The same is true here.

The distinctions the FTC tries to draw to distinguish calls placed to members or existing donors from calls placed to prospective members or donors strain credulity. *See* FTC Br. 34–35. The FTC's reliance on its 2008 rulemaking findings concerning the intrusiveness of "recorded messages" due to their lack of "interactive, two-way conversation" is particularly jarring in the context of this litigation, given that the FTC conceded in its September 2009 letter that soundboard calls do not fit within the class of calls regulated by the robocall prohibition. *See* Doc. 1-3 at 3.

In any event, numerous equally effective alternatives are available to the FTC to regulate

invasive telemarketing calls in lieu of an outright ban on all charitable calls to prospective donors or members that contain a request for a charitable contribution. These important alternatives enable the homeowner to choose what calls may be received and what calls may not, including national and state do-not-call lists as well as company-specific do-not-call lists, call abandonment rules, opt-out requirements, call blocking technology, and caller ID requirements. A number of civil and penal laws in place at the federal and state levels empower the FTC as well as states and private citizens to punish unlawful speech rather than prevent fully protected speech before it is to occur.

The burden is on the FTC to explain why any of the ample alternatives are insufficient to protect consumers' privacy interests. The FTC fails to carry that burden.

## II.     SBA MEMBER COMPANIES FACE IRREPARABLE HARM.

The FTC contends that SBA has not established irreparable harm from the November 10 letter, but those contentions rest largely on mischaracterizations about the letter and about the harm that SBA's members will suffer from the letter. For instance, the FTC claims that the letter "does not direct any company to stop using soundboard." But that is precisely what the letter does when it instructs SBA's members "to bring themselves into compliance." The FTC's contrary reading is untenable.

There are two problems with the FTC's next argument — that, because the letter is "without legal effect," it cannot cause irreparable harm. First, as explained above, that argument assumes the (wrong) answer to the central question in this case: Is the letter practically binding? (It is.) Second, the FTC's argument is contrary to Supreme Court precedent endorsing the view that irreparable harm must be assessed in the "practical business sense," with an eye to "the obviously intended consequences of the challenged regulations." *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 173 (1967); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 507 (1959)

(noting that "irreparable harm" is a "practical term[]"). The FTC's hyperformal analysis, by contrast, asks the Court to ignore the practical, business realities of the November 10 letter.

Next, the FTC points out that the November 10 letter does not foreclose all uses of soundboard. That's true; it only forecloses all use relating to telemarketing, which is the use that makes it possible for U.S.-based call centers to remain in operation and compete on a cost basis with offshore ones. It is also the use through which SBA members exercise their right to speak. To the extent that the FTC's primary concern is enforcing compliance with TSR provisions, those U.S.-based call centers are already subject to FTC jurisdiction and enforcement, whereas the offshore ones are more difficult for the FTC to reach. Ironically, as SBA noted in its meetings with the FTC and in the declarations it has provided, the FTC's unwarranted attack on all uses of soundboard technology for telemarketing purposes, including compliant uses, will increase rather than reduce the volume of non-compliant calls received by consumers. *See* Doc. 4-3 ¶ 35 The FTC tiptoes around that fact by emphasizing that there are myriad other uses of soundboard technology beyond the ones banned by the letter, and that SBA's members have acknowledged and even engaged in those uses. True again, but with the caveat noted in the declarations that those remaining uses of soundboard technology will become less attractive and less viable if even compliant use of the technology is prohibited for telemarketing purposes. Thus, the fact that some uses of soundboard will remain lawful after the letter is, as the declarations make clear, largely meaningless to the soundboard technology industry.

The FTC also contends that any harm to SBA's members is insufficiently "imminent" to warrant preliminary relief because SBA has only offered "prognostications about the *long-term* consequences" of the November 10 letter. But nothing in the declarations suggests that the November 10 letter's effects — including workforce reductions and cessation of U.S. operations

— are of the "long-term" sort. Just the opposite, the hard *compliance* deadline set by the letter, together with its demand that SBA's members cease using soundboard for its principal purpose, clearly establishes that the letters effects will be — indeed, must be — completed by May 12, 2017, well before litigation in this matter would typically be complete. Contrary to the FTC's assertion, therefore, SBA has established a "clear and present" risk of irreversible effects that will occur while this case is pending. *E.g.*, Doc. 4-3 ¶ 11.

As a final point, it bears noting that the question of harm generally is another one that the FTC avoided confronting by failing to undertake this action as part of a rulemaking. For example, had it undertaken a rulemaking, it would have been required, among other things, to consider the economic impact of its rule on small entities (which comprise the membership of SBA). *See* 5 U.S.C. §§ 601–612 (Regulatory Flexibility Act). In its current posture, the FTC feels comfortable sitting back and picking apart SBA's declarations based on its review of certain member company websites and the suppositions it draws from them. How convenient. And the piece de resistance of it all is the FTC's later contention that this Court should not permit SBA to call its declarants to testify in court about the harms SBA member companies are facing. *See* FTC Br. 32–43. The Court should reject this "heads we win, tails you lose" posturing. It is just a titch too rich for the FTC to impugn the integrity and truthfulness of SBA's declarants but then, on the question of testimony, state the "declarations are more than sufficient to help the Court understand the basis for SBA's irreparable harm claims." *Id.*

Notwithstanding Local Civil Rule 65.1(d), the judges of this Court frequently hear witnesses in connection with preliminary injunction motions where it is helpful to the Court's decision-making. Respectfully, if the FTC wants to maintain its assault on the integrity of SBA's declarants, the Court should avail itself of the benefit of live testimony.

III.    **THE PUBLIC INTEREST AND BALANCE OF EQUITIES SUPPORT ENTRY OF AN INJUNCTION.**

In arguing that the public interest and balance of equities weigh against an injunction in this case, the FTC attributes to SBA goals and arguments that SBA is not pursuing. The FTC contends, for example, that SBA is seeking to bar the Commission from enforcing the TSR against the use of soundboard. Hardly. As SBA emphasized in its opening brief, "the FTC is free to pursue an enlargement of the TSR to regulate soundboard — *this time through the notice-and-comment procedures required* by the Telemarketing Act and APA." P.I. Memo 43 (emphasis added). The issue in this case, in other words, is not whether the FTC has authority to prohibit certain uses of soundboard — an issue about which SBA takes no position — but whether the FTC may prohibit them without going through notice-and-comment rulemaking.

The FTC next contends that SBA is asking the Court to take the "extraordinary" step of "[i]nterfering with an agency's prosecutorial discretion." FTC Br. 41. No it is not. SBA has no quibble with the FTC's discretion to investigate suspected TSR violations. The FTC thus engages in hyperbole in arguing that, if the Court grants SBA's motion, staff will not be able to investigate abusive telemarketing practices and that the FTC will somehow be rendered powerless to stop such practices. That this argument shares space with the FTC's earlier boast that it "vigorously" enforces the TSR and has brought "hundreds" of cases, *see id.* at 15, speaks volumes about its credibility. The relief that SBA requests has absolutely no bearing on the FTC's investigative powers under its existing authorities. SBA asks only that the Court enjoin the FTC from treating the making of soundboard calls as prohibited prerecorded calls, and even then only to the extent the FTC does not, through some future action, promulgate a lawful amendment to the TSR's robocall prohibition. Meanwhile, nothing in the relief SBA seeks would

prevent the FTC from investigating and prosecuting much of the conduct it complains about — including abusive uses of soundboard — using the vast array of other tools it has at its disposal.

The FTC's final argument about preliminary relief — that an injunction would discourage agencies from providing guidance in the future — again assumes the (wrong) answer to the question at the heart of this case, *i.e.*, that the November 10 letter is guidance. An injunction would obviously be improper and harmful if the letter were guidance, but the letter is a regulation masquerading as guidance. Courts have roundly and repeatedly condemned agencies for attempting to subvert the APA's requirements by imposing binding requirements on industry via so-called "guidance documents." *See, e.g.*, *Nat. Res. Def. Council*, 643 F.3d at 320–21 (purported "guidance document" was actually a regulation); *Gen. Elec. Co.*, 290 F.3d at 377 (same); *Iowa League of Cities v. EPA*, 711 F.3d 844, 875 (8th Cir. 2013) (same). That is precisely what the FTC is trying to get away with here. This Court should not let it.

In sum, almost all of the harms — to the FTC and the public — that the FTC alleges are figments of the FTC's institutional imagination. And the few that have even a whiff of substance are substantially outweighed by the economic and occupational costs that will result from denying SBA's motion. The public interest and the balance of equities favor granting SBA's request for a preliminary injunction.

## **CONCLUSION**

For the reasons given, the Court should grant the preliminary injunction and other relief requested in SBA's Application by entering the attached proposed order.

Respectfully submitted,

*/s/ Daniel W. Wolff*
Daniel W. Wolff (D.C. Bar. No. 486733)
     dwolff@crowell.com
Peter B. Miller
Mark R. Thomson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2595
Phone: 202-624-2500
Fax: 202-628-5116

*Attorneys for Plaintiff*
*Soundboard Association*

February 24, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2017, Plaintiff Soundboard Association filed the foregoing document through the United States District Court ECF System to be served by CM/ECF electronic filing on all counsel of record.

<u>*/s/ Daniel W. Wolff*</u>
Daniel W. Wolff