## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                            )
**SOUNDBOARD ASSOCIATION,**                 )
                                            )
    **Plaintiff,**              )
                                            )
      **v.**             )     **Case No. 17-cv-00150 (APM)**
                                            )
**U.S. FEDERAL TRADE COMMISSION,**          )
                                            )
    **Defendant.**              )
_____ )

## MEMORANDUM OPINION

Almost every American who owns a telephone has experienced it: The phone rings, you pick up, there is a distinct pause, and then an automated voice begins to make you an unsolicited sales offer. Such calls, popularly known as "robocalls," are subject to heavy federal regulation. Generally speaking, a telemarketer cannot direct a robocall to a person unless that person first consents in writing to receipt of the call. Thus, while federal regulations do not absolutely bar robocalls, the written-consent requirement, along with other restrictions—collectively, "the robocall regulation"—render marketing via robocall prohibitively expensive.

But not all automated voices are created the same. The traditional robocall consists of a one-way telemarketing message that involves no live sales agent or other human interaction. "Soundboard" technology—the subject of this case—is different. It involves two-way communication between sales agent and consumer, in which the sales agent plays pre-recorded audio clips in response to the consumer's statements. Soundboard technology also allows the sales agent to break into the call and speak directly to the consumer, if needed. Say, for instance, a consumer asks for additional information about how to buy a product. A sales agent using

soundboard technology first attempts to answer that inquiry by playing a pre-recorded audio file. If the pre-recorded response is unsatisfactory, then the sales agent can intervene and give the consumer a direct response.  So, like a traditional robocall, soundboard technology uses automated, pre-recorded messages to convey information.  But, it differs markedly from the traditional robocall in that a human being is on the other end of the line, who is sometimes revealed to the consumer and sometimes not.

Until recently, the robocall regulation did not apply to calls using soundboard technology. In September 2009, the staff of Defendant Federal Trade Commission ("FTC") issued an "informal" opinion letter, concluding that, because calls using soundboard technology enable the caller and recipient to have a two-way conversation, such calls are not subject to the robocall regulation.  Seven years later, the agency changed course.  Citing "widespread use of soundboard technology in a manner that does not represent a normal, continuous, two-way conversation between the call recipient and a live person," the FTC staff issued a second opinion letter in November 2016—which the court will refer to as the "November 2016 Letter"—that reversed its earlier position.  The staff's view now was that telemarketing calls using soundboard technology are subject to the general prohibition placed on traditional robocalls.  The FTC staff gave the telemarketing industry until May 12, 2017, "to make any necessary changes to bring themselves into compliance."

Plaintiff Soundboard Association is a trade group representing companies that manufacture and use soundboard technology.  It asserts that the November 2016 Letter is unlawful for two reasons.  First, Plaintiff asserts that the November 2016 Letter is a "legislative rule" that the FTC failed to promulgate through notice and comment, as required under the Administrative Procedure Act ("APA").  Second, it contends that the November 2016 Letter is an unconstitutional restriction

on speech because the robocall regulation's written-consent requirement does not apply to pre-recorded solicitation calls between a non-profit charitable organization and its existing donors, but it does apply to such calls with potential first-time contributors. According to Plaintiff, that distinction renders the robocall regulation a content-based regulation of speech that cannot be justified under strict scrutiny.

The court rejects both claims. First, the court finds that, although the FTC's November 2016 Letter is a final, reviewable agency action, the Letter is not a legislative rule, but is, at most, an interpretive rule that the FTC was not required to issue through notice and comment under the APA. Second, the court concludes that the November 2016 Letter does no more than subject soundboard calls to valid time, place, and manner restrictions. The exemption provided to pre-recorded calls on behalf of charitable organizations to existing donors, but not to charitable organizations' calls to potential, first-time donors, is a content-neutral regulation of speech that easily satisfies the requisite intermediate scrutiny. Accordingly, the court denies Plaintiff's Motion for Summary Judgment and grants Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    The "Robocall" Regulation

In 1994, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act to protect consumers from deceptive and abusive telemarketing practices. *See* Telemarketing and Consumer Fraud and Abuse Prevention Act, Pub. L. No. 103-297 § 2, 108 Stat. 1545 (1994). The Act charges the U.S. Federal Trade Commission ("FTC") with prescribing rules regulating the telemarketing industry. 15 U.S.C. § 6102(a)(1). Pursuant to that authority, in 1995, the FTC promulgated the Telemarketing Sales Rule ("TSR"). Telemarketing Sales Rule, 60 Fed. Reg.

43,842 (Aug. 23, 1995), *codified at* 16 C.F.R. pt. 310.  The TSR prohibits telemarketing calls at certain times of day, allows consumers to request placement on a "do-not-call" list, and imposes other requirements on telemarketers.  *See id.* § 310.4(b)(ii), (c).

In 2008, the FTC amended the TSR to include new regulations on robocalls. *See* Telemarketing Sales Rule, Final Rule Amendments, 73 Fed. Reg. 51,164, 51,184 (Aug. 29, 2008).  The amendments barred telemarketers from "[i]nitiating any outbound telephone call that delivers a prerecorded message" without first obtaining "an express agreement, in writing" from the consumer.  16 C.F.R. § 310.4(b)(1)(v).  The written "express agreement" must include certain elements, such as language demonstrating the consumer's willingness to receive the robocalls, the consumer's telephone number, and the consumer's signature.  *Id.* § 310.4(b)(1)(v)(A)(i)–(iv).  The 2008 TSR Amendments further provide that, even when a telemarketer has an express agreement in hand, the telemarketer's robocall must adhere to strict caller disclosure and consumer opt-out notice requirements.  *Id.* § 310.4(b)(1)(v)(B).  This opinion refers to these restrictions collectively as "the robocall regulation."

The written consent requirement does not apply to pre-recorded calls made on behalf of charitable organizations to past donors or current members.  Instead, the robocall regulation specifically provides that charitable organizations may place robocalls "to induce a charitable contribution from a member of, or previous donor to," the organization without obtaining an express written agreement from the member or donor.  *Id.*  In carving out this exception, the FTC explained that it sought to balance the interest of non-profit organizations in seeking donations via telephone with the privacy rights of consumers.  It reasoned that prior donors had a reduced privacy interest because, by donating to the organization previously, they are deemed to have consented to receiving future charitable solicitation calls.  73 Fed. Reg. at 51,193–94.

2.      *The FTC Applies the Robocall Regulation to Soundboard Technology*

As noted, the traditional robocall is a one-way, pre-recorded communication that does not involve any human interaction.  Soundboard technology, on the other hand, allows for a two-way conversation between the caller and recipient.  After initiating a soundboard call, a live sales agent uses pre-recorded audio clips to respond to the recipient's statements and can, if necessary, opt to engage in a live conversation with the consumer.  Thus, like a robocall, soundboard technology uses pre-recorded messages to market a good or service, but ultimately differs from a robocall because it depends on a live sales agent.

This technological distinction prompted questions within the telemarketing industry as to whether soundboard calls would be subject to the robocall regulation.  Before the new regulations went into effect in September 2009, *see* 73 Fed. Reg. at 51,164, a telemarketing firm, Call Assistant LLC, sent a letter to the FTC seeking clarification of whether the technological distinction placed soundboard calls outside of the scope of the robocall regulation.  Def.'s Opp'n to Pl.'s Appl. for Prelim. Inj., ECF No. 11 [hereinafter Def.'s Opp'n], Ex. 2, ECF 11-2.  Call Assistant's letter specifically asked whether its "[soundboard] system conforms to the TSR Amendment." *Id.*

On September 11, 2009, the FTC responded with an "informal staff opinion" signed by Lois Greisman, the FTC's Associate Director of the Division of Marketing Practices ("September 2009 Letter").  Compl., ECF No. 1 [hereinafter Compl.], Ex. 2, ECF No. 1-3 [hereinafter Sept. 2009 Letter].  The September 2009 Letter stated that "the staff of the [FTC] has concluded that the 2008 TSR Amendments . . . do not prohibit telemarketing calls using this technology." *Id*. Greisman explained that the robocall regulation "prohibit[s] calls that deliver a prerecorded message and do not allow interaction with call recipients . . . . Unlike the technology that you describe, the delivery of prerecorded messages in such calls does not involve a live agent who

controls the content and continuity of what is said to respond to concerns, questions, comments—or demands—of the call recipient." *Id.*   Quite naturally, the September 2009 Letter led telemarketers to believe that soundboard calls, unlike traditional robocalls, did not have to conform to the written-consent component of the robocall regulation. *See* Notice of Filing of Pl.'s Corrected Appl. for Prelim. Inj., ECF No. 4, Mem. in Supp., ECF No. 4-2 [hereinafter Pl.'s Mot.], Ex. 1, ECF No. 4-3 [hereinafter Coombs Decl.], ¶ 18 (stating that it has been "widely understood" since the September 2009 Letter that soundboard calls did not fall under the robocall regulation, and "SBA member companies relied on that assurance as we developed and grew our businesses"); Pl.'s Mot., Ex. 2, ECF No. 4-4, ¶ 6; Pl.'s Mot., Ex. 3, ECF No. 4-5, ¶ 4; Compl., Ex. 7 (PACE Soundboard Technology White Paper), ECF No. 1-8, at 7 (stating that relying on the September 2009 Letter, "the contact center industry has continued using and investing in Soundboard" and subjecting it now to the robocall regulation will "detrimentally impact[]" the soundboard industry).

The September 2009 Letter remained the FTC's position on soundboard technology for more than seven years.  Then the FTC changed its mind.   According to the FTC, sometime after September 2009, it began seeing an increased number of consumer complaints, as well as press articles, about the improper use of soundboard technology.  Specifically, they received complaints that consumers were not receiving appropriate responses to their questions and comments and that live operators were not intervening in calls.  Def.'s Opp'n, Ex. 1, ECF No. 11-1 [hereinafter Bandy Decl.], ¶ 5.  Additionally, the FTC staff received evidence that sales agents using soundboard technology were handling more than one call at a time, which made the practice more like placing robocalls and therefore undercut the FTC staff's rationale behind the September 2009 Letter. *Id.*; Compl., Ex. 1, ECF No. 1-2 [hereinafter Nov. 2016 Letter], at 2–3.

These concerns about the technology's use prompted the FTC staff to reach out to telemarketing trade groups to hear the industry's perspective. *Id.* ¶ 6. In the early part of 2016, the FTC staff had at least two meetings with the trade groups, during which industry representatives shared information about the use and operation of soundboard technology. *Id.* ¶¶ 7–9. The FTC staff also collected data about soundboard technology's use. *Id.* ¶¶ 5, 10.

On November 10, 2016, the FTC staff announced that it now considered soundboard calls subject to the robocall regulation. Nov. 2016 Letter at 2. The November 2016 Letter explained that the FTC had changed its position on the applicability of the TSR to soundboard technology:

> Given the actual language used in the TSR, the increasing volume of consumer complaints, and all the abuses we have seen since we issued the September 2009 letter, we have decided to revoke the September 2009 letter. It is now staff's opinion that outbound telemarketing calls that utilize soundboard technology are subject to the TSR's prerecorded call provisions because such calls do, in fact, "deliver a prerecorded message" as set forth in the plain language of the rule.

*Id.* at 3. The FTC staff added that the evidence it had gathered showing the misuse of soundboard technology was "inconsistent with the principles we laid out in our September 2009 letter as well as our understanding of the technology at the time we issued the letter." *Id.* at 2.

The FTC staff gave the telemarketing industry time to adjust to its new position. It announced that, "[i]n order to give industry sufficient time to make any necessary changes to bring themselves into compliance," the September 2009 Letter's revocation would become effective in six months, on May 12, 2017. *Id.* at 4. The November 2016 Letter closed by stating that "the views expressed in this letter are those of the FTC staff" and "have not been approved or adopted by" and "are not binding upon" the Commission. *Id.* "However, they do reflect the views of staff members charged with enforcement of the TSR." *Id.*

### B.      Procedural Background

The Soundboard Association ("SBA") filed suit in this court on January 23, 2017, advancing claims under the Administrative Procedure Act ("APA"), the First Amendment, and the Declaratory Judgment Act that the November 2016 Letter does not reflect lawful agency action. Compl. ¶¶ 1, 79. Those claims are predicated on two theories. First, Plaintiff contends that the November 2016 Letter is a legislative rule that the FTC was required to promulgate through notice and comment, which it did not do. *Id.* ¶¶ 65–66. Second, Plaintiff claims that the November 2016 Letter unlawfully subjects telemarketers using soundboard technology to regulations that "treat[] speech tailored for first-time donors differently than speech tailored for previous donors," *id.* ¶ 74, and that such a content-based regulation does not survive strict scrutiny under the First Amendment. *Id.* ¶¶ 70–79. Plaintiff also seeks a declaration that the FTC violated the APA in issuing the November 2016 Letter. *Id.* at ¶ 83.

Plaintiff simultaneously filed a Motion for Preliminary Injunction with its Complaint, asking the court to enjoin enforcement of the May 12, 2017, compliance deadline until the court ruled on the merits. *See* Pl.'s Mot. at 1. The parties agreed to consolidate the hearing on the preliminary injunction motion with the "trial" on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Order, ECF No. 16, at 1; Fed. R. Civ. P. 65(a)(2); *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62–63 (D.D.C. 2014). Thus, with their consent, the court treats the parties' pleadings as cross-motions for summary judgment.

## II.      LEGAL STANDARD

Ordinarily, cross-motions for summary judgment are reviewed under the standard set forth in Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, a court may grant summary judgment when a party demonstrates that there is no genuine issue of material fact and shows it is

entitled to judgment as a matter of law.  However, in cases such as this one that involve review of agency action under the APA, the Rule 56 standard does not apply.  *See Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).  Instead, "the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law."  *Am. Biosci. Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted) (collecting cases).  In this posture, the court must decide "whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *See Se. Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

## III.   DISCUSSION

### A.   Whether the November 2016 Letter is a Final Agency Action

Before proceeding to the merits of Plaintiff's APA claim, the court must address the vigorously contested threshold issue of whether the November 2016 Letter is a "final agency action," within the meaning of the APA.  *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  If it is, then the court may address the merits of Plaintiff's claims.  If it is not, then the Letter is not reviewable, and the court's inquiry comes to an end.  *See id.*

The APA allows for judicial review of a "final agency action."  5 U.S.C. § 704.  For an agency action to be final, it must possess two characteristics.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  First, the action must "mark the consummation of the agency's decision-making process"—in other words, it cannot be "tentative or interlocutory."  *Id.* (internal quotation marks omitted).  Second, it must determine "rights or obligations" or have "legal consequences."  *Id.* at 178 (internal quotation marks omitted).  Whether an agency action is final is a "'flexible' and

'pragmatic'" inquiry.  *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).

The D.C. Circuit has identified three additional factors for courts to consider in assessing the finality of an agency action—factors it has characterized as "complementary" to the two-part *Bennett* inquiry.  *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011).  Those factors, as articulated by the court in *Ciba-Geigy Corp. v. EPA*, are: (1) whether the agency "ha[s] taken a 'definitive' legal position concerning its statutory authority"; (2) whether the case presents "'a purely legal' question of 'statutory interpretation'"; and (3) whether the agency action imposes "an immediate and significant practical burden" on Plaintiff.  *Id.* (quoting *Ciba-Geigy*, 801 F.2d at 435–37).

On occasion, the D.C. Circuit has applied the three *Ciba-Geigy* factors as a proxy for the two-part *Bennett* inquiry, particularly in cases that involve a pre-enforcement challenge to agency action.  For example, in *CSI Aviation Services v. U.S. Department of Transportation*, the court relied primarily on the *Ciba-Geigy* factors to find that a Department of Transportation cease-and-desist letter was a reviewable final agency action.  *See* 637 F.3d at 411–13.  It reached the same conclusion in *Reckitt Benckiser Inc. v. EPA*, holding that an EPA-issued misbranding notice qualified as a final agency action.  613 F.3d 1131, 1136–41 (D.C. Cir. 2010).  *Cf. John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561, 566–67 (D.C. Cir. 2007) (holding that "[b]oth *Bennett* and *Ciba-Geigy* firmly support a finding of finality" where DEA affirmatively denied drug manufacturer's permit application to import generic version of FDA-approved drug for testing, blocking manufacturer's plans to market the generic version).

Whether this court applies either the two-part *Bennett* test or the three *Ciba-Geigy* factors, the result is the same:  the November 2016 Letter constitutes a final agency action.

1.      *The* Bennett *Test*

a.      The First Element of the *Bennett* Test

The court finds that the November 2016 Letter represents the "consummation" of the FTC's decision-making process. *See* 520 U.S. at 177–78. The November 2016 Letter was the culmination of months of investigation and deliberation by the FTC's Division of Marketing Practices, which is charged with enforcing the TSR. The FTC staff not only considered consumer complaints, but also proactively sought out and received input from the telemarketing industry. Nov. 2016 Letter at 2 ("During the last few months, we have had multiple productive discussions and meetings with [industry groups]" and "[s]taff carefully considered the input" of these groups); *see also* Bandy Decl. ¶¶ 5–10. Neither the FTC staff nor the Commission itself presently is reviewing the position announced in the November 2016 Letter; nor is any review anticipated in the near future. *See* Oral Argument Tr. (rough draft), at 33 (FTC counsel stating, "[FTC rules] certainly allow[] the Commission to rescind the guidance at any time, but I'm unaware of any action suggesting it's doing so."). Thus, for all intents and purposes, the agency's review of whether the robocall regulation applies to soundboard calls is at an end.

The FTC disputes that the November 2016 Letter constitutes the consummation of the agency's decision-making because it is "an informal, tentative assessment of the law by a subordinate official." Def.'s Opp'n at 17. It is merely "staff advice," the FTC contends, issued by a subordinate official, who "do[es] not speak for the agency," and is not binding on the Commission. *Id.* (citing 16 C.F.R. §§ 1.26(d), 1.3(c), 2.14(a), 3.11(a)) (alteration omitted). That argument is unavailing. The fact that a lower-level agency official issued the November 2016 Letter, rather than the Commission itself, is not dispositive. The D.C. Circuit has made clear that legal positions announced, as here, by subordinate officials responsible for oversight can constitute

final agency action.  *See, e.g.*, *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531–32 (D.C. Cir. 1990) (finding that letters from the "Acting Assistant Administrator for Air and Radiation" were final agency actions, given that the author was "clearly speaking in an official rather than a personal capacity" and there was no reason to question his authority to speak for the EPA); *Nat. Res. Def. Council, Inc. v. Thomas*, 845 F.2d 1088, 1094 (D.C. Cir. 1988).  And, while the Commission does have the power to rescind the Letter, *see* Def.'s Opp'n at 17 (citing 16 C.F.R § 1.3(c)), the mere prospect that it might do so does not insulate the Letter from judicial review. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. ___, 136 S. Ct. 1807, 1813–14 (2016) (observing that the mere possibility of revision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"); *accord Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016).

Moreover, contrary to the FTC's position, the November 2016 Letter is not a mere "ruling" or "recommendation" from a subordinate official that is still subject to review and therefore not a final agency action.  *See, e.g.*, *Abbott Labs.*, 387 U.S. at 151; *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 669–70 (D.C. Cir. 2016).  Rather, it reflects the "views of staff members charged with enforcement of the TSR."  Nov. 2016 Letter at 4.  The court has no reason to believe that the FTC staff's "considered determination" on the use of soundboard technology does not, as a practical matter, reflect the position of the agency itself.  *Safari Club Int'l*, 842 F.3d at 1289.

The Supreme Court's decision in *FTC v. Standard Oil of California* does not, as the FTC argues, compel a different result.  Def.'s Opp'n at 18.  There, the Court held that the FTC's decision to commence an enforcement action was not a final, reviewable action.  449 U.S. 232, 242–43 (1980).  Such an action, the Court reasoned, was not final because "[i]t had no legal force or practical effect upon [the company's] daily business other than the disruptions that accompany any

major litigation.  And immediate judicial review would serve neither efficiency nor enforcement of the [law]."  *Id.* at 243.  Based on *Standard Oil*, the FTC argues that, if the decision to initiate an actual enforcement action is not a final agency act, then it is "impossible to see how it can be a final action when FTC staff issues a letter indicating how it might make recommendations for Commission enforcement."  Def.'s Opp'n at 18.

Though the FTC's argument has some intuitive appeal, it is wrong as a matter of law.  The Supreme Court has taken different approaches on the question of finality as between the pre- and post-enforcement contexts.  For example, in *Frozen Food Exp. v. United States*, the Court addressed an agency order specifying that certain commodities were not considered "agricultural" commodities, which would make motor vehicles transporting them exempt from permitting and certification requirements.  351 U.S. 40, 41 (1956).  Although the agency had yet to initiate or threaten an enforcement action, the Court held that the agency's order was final because it "had an immediate and practical impact on carriers who are transporting the commodities, and on shippers as well."  *Id.* at 43–44.  The order, the court explained, forms "the basis for carriers in ordering and arranging their affairs . . . . [and] sets the standard for shaping the manner in which an important segment of the trucking business will be done."  *Id.*  The agency's order also "warns every carrier, who does not have authority from [the agency] to transport those commodities, that it does so at the risk of incurring criminal penalties."  *Id.*; *cf. Abbott Labs.*, 387 U.S. at 153 (holding reviewable prior to enforcement FDA regulations that forced drug manufacturers to "risk serious criminal and civil penalties" for noncompliance, or incur large expenses to come into compliance).

Though over 60 years old, *Frozen Foods* remains vibrant today.  Recently, the Court in *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, relying on *Frozen Foods*, held that an Army Corps of Engineers' "jurisdictional determination" that subjected property to the Clean Water Act

was a final reviewable action.  136 S. Ct. at 1811, 1814.  The Court explained that, because the Corps' jurisdictional determination "warns that if [the companies] discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties," it is a final agency action.  *Id.* at 1815.

The November 2016 Letter at issue in this case bears all of the hallmarks of final agency action present in *Frozen Foods* and *Hawkes*.  Acting through its staff, the FTC has taken a definitive position that telemarketing calls deployed with soundboard technology are subject to the robocall regulation.  The Letter also puts companies on notice and gives them time "to bring themselves into compliance." Nov. 2016 Letter at 4.  The upshot of the Letter could not be clearer: telemarketing companies either must undertake the expense of coming into compliance with the agency's new position or risk enforcement action.  Thus, the Letter has an "immediate and practical impact" on the telemarketing industry and "sets the standard for shaping the manner in which" it does business. *Frozen Food*, 351 U.S. at 44.  The November 2016 Letter, therefore, constitutes a reviewable final action.

      b.    The Second Element of the *Bennett* Test

Having concluded that the November 2016 Letter has a "immediate and practical impact" on the telemarketing industry, the Letter also then satisfies the second element of the *Bennett* test— the agency's action determines "rights or obligations."  520 U.S. at 178; *see also Hawkes*, 136 S. Ct. at 1814 (citing the "definitive nature" of the Corps' decision as giving rise to "direct and appreciable legal consequences" (quoting *Bennett*, 520 U.S. at 178)).

The FTC contends that the November 2016 Letter fails the second prong, arguing that, at most, it requires telemarketers to "choose 'between voluntary compliance' and the 'prospect of having to defend [themselves]' in FTC enforcement litigation."  Def.'s Opp'n at 19 (quoting

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003)).   The FTC relies primarily on two cases to support its position: *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*, 324 F.3d 726, and *Holistic Candlers and Consumers Association v. Food & Drug Administration*, 664 F.3d 940 (D.C. Cir. 2012).   In each case, the D.C. Circuit held agency letters to manufacturers to be nonfinal.   Both, however, are distinguishable from the facts presently before the court.

   *Reliable Automatic Sprinkler* differs from the present case because, whereas the letter there announced the agency's *investigation* into whether its rule applied to the plaintiff's product, the November 2016 Letter reflects the FTC's *conclusion* that soundboard technology is subject to the robocall regulation.   In *Reliable Automatic Sprinkler*, the Consumer Product Safety Commission issued a letter to a sprinkler manufacturer communicating "the intention of the Compliance staff to make the preliminary determination that these sprinklers present a substantial product hazard, as defined by . . . 15 U.S.C. § 2064(a)."   324 F.3d at 730.   The D.C. Circuit held that the Commission's letter was not a reviewable agency action because "[t]he agency's conduct thus far amounts to an investigation of appellant's sprinkler heads, a statement of the agency's intention to make a preliminary determination that the sprinkler heads present a substantial product hazard, and a request for voluntary corrective action."   *Id.* at 731.   Unlike the letter in *Reliable Automatic Sprinkler*, the November 2016 Letter does not request mere "voluntary corrective action."   Rather, it conclusively states that soundboard calls must comply with the robocall regulation.   Indeed, the FTC staff acknowledged that its new position effectively meant that telemarketers no longer would be able to use soundboard calls to induce the purchase of any good or service.   *See* Nov. 2016 Letter at 3.   That much is clear from the FTC staff's pointing out that *other* uses of soundboard technology—such as for non-telemarketing calls, including political, survey, and pure

informational calls, and for responding to in-bound calls—remain permissible under the TSR, as well its observation that those other uses constitute a "significant percentage" of overall soundboard technology use. *Id.* at 4. Thus, the Letter does not seek mere voluntary compliance; it effectively prohibits a use of soundboard technology. *Cf. Safari Club Int'l*, 842 F.3d at 1289 (holding that agency's "de facto denial of permits" "leads inexorably to the conclusion that [the plaintiff's] 'rights . . . have been determined'" (second alteration in original) (quoting *Bennett*, 520 U.S. at 178)).

*Holistic Candlers* is distinguishable for similar reasons. In *Holistic Candlers*, the D.C. Circuit considered warning letters the FDA had issued to manufacturers of "ear candles," advising that the agency considered the products to be adulterated and misbranded medical devices. 664 F.3d at 942. The FDA's warning letters did not, however, conclusively determine whether the ear candles actually were medical devices. Instead, the letters

> advise[d] the recipients that 'it *appears* your ear candles are intended to mitigate or treat' the listed disorders, explain[ed] where to get the 'information you need to submit in order to obtain approval or clearance for your device,' and state[d] that 'FDA *will evaluate* the information you submit and decide whether your product may be legally marketed.'

*Id.* at 944. In light of this language, the D.C. Circuit found that the letters failed to reflect the consummation of the FDA's decision-making process. *Id.* The court also held that the letters could not determine rights or obligations, or constitute a decision from which legal consequences flow, because they prompted only voluntary compliance with the FDA's preliminary assessment of the ear candles; the FDA's decision-making process plainly remained ongoing. *Id.* at 944–45. The same cannot be said of the November 2016 Letter. The Letter definitively finds that soundboard technology is subject to the robocall regulation, and it does not invite industry to submit additional information to inform an ongoing decision-making process. *Cf. id.* at 942, 946.

The FTC staff already has taken industry input into consideration, and the November 2016 Letter announces the staff's final decision that the robocall regulation applies to soundboard technology. Accordingly, the warning letters at issue in *Holistic Candlers* are distinguishable from the November 2016 Letter, and that case does not change the court's analysis.

### 2.    *The Ciba-Geigy Factors*

A review of the three "complementary" *Ciba-Geigy* factors only bolsters the court's conclusion that the FTC staff's change in position constitutes a reviewable, final agency action. The first factor—whether the agency has stated a "definitive" position as to its statutory authority—is satisfied because the FTC staff has taken the "definitive" legal position that soundboard calls are subject to the robocall regulation. *See CSI Aviation*, 637 F.3d at 478. Like the agency actions at issue in both *Ciba-Geigy* and *CSI Aviation*, the November 2016 Letter "admit[s] of no ambiguity" and "[gives] no indication that it [is] subject to further agency consideration or possible modification." *Ciba-Geigy*, 801 F.2d at 436–37. Although the Letter recites the truism that the Commission is not bound by the staff's position, such text is mere boilerplate and does not create doubt about the finality of the agency's position. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (rejecting the argument that "boilerplate" language in an agency guidance document is dispositive as to whether an agency action has legal consequences); *compare* Sept. 2009 Letter at 3, *with* Nov. 2016 Letter at 4.

This case also presents a purely legal question. *See Ciba-Geigy*, 801 F.2d at 437. Although this case does not involve a "pure legal" question of "statutory interpretation," as in *Ciba-Geigy* and *CSI Aviation*, the question presented—whether November 2016 Letter is a "legislative rule" under the APA—would not "benefit from a more concrete setting." *Id.* at 435. The answer to that

legal question depends entirely on the context in which the Letter was adopted, and it does not depend on further development of the administrative record. *See CSI Aviation*, 637 F.3d at 412.

Finally, as already discussed, the November 2016 Letter imposes "an immediate and significant practical burden" on the telemarketing industry, thereby satisfying the third *Ciba-Geigy* factor. *Id.* The FTC staff's reversal effectively bars the use of soundboard technology to place outgoing calls to promote the sale of goods or services. *See id.* (finding agency's cease-and-desist letter that "effectively declared the company's operations unlawful" to be a final agency action). Even if not an effective prohibition, at a minimum, the agency's action "cast[s] a cloud of uncertainty" over the continued use of soundboard technology for telemarketing purposes. *Id.* As noted, it puts the telemarketing industry to the "painful choice" between "costly compliance and the risk of prosecution at an uncertain point in the future." *Id.*

In summary, the three *Ciba-Geigy* factors all point to the conclusion that the November 2016 Letter is a final, reviewable agency action. The D.C. Circuit's observation in *CSI Aviation*—"[h]aving thus flexed its regulatory muscle, [the agency] cannot now evade judicial review"—is equally applicable here. *Id.* at 413. In light of the November 2016 Letter's conclusive determination that soundboard technology falls within the purview of the robocall regulation, which will take effect in a matter of weeks, the court concludes that the Letter constitutes final agency action subject to judicial review.

### B.   Whether the November 2016 Letter is a Legislative or Interpretive Rule

The court now arrives at the merits of Plaintiff's APA claim. The narrow question presented is whether the November 2016 Letter is a "legislative" as opposed to an "interpretive" rule.[1] If it is a legislative rule, then the FTC was required to issue the Letter pursuant to notice-

---

[1] The FTC also has argued that the November 2016 letter is not a "rule" as defined by the APA. Def.'s Opp'n at 21–22. Because the court concludes the November 2016 Letter is not a legislative rule, it need not reach that issue.

and-comment rulemaking under the APA; on the other hand, if it is an interpretive rule, then the FTC's direct issuance of the Letter to an industry representative did not run afoul of the APA. *See* 5 U.S.C. § 553(b); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. ___, ___, 135 S. Ct. 1199, 1203 (2015). Plaintiff's challenge to the November 2016 Letter is, therefore, purely procedural; the court is not tasked with evaluating its substance.[2]

The line separating a legislative rule from an interpretive rule is not always clear, and the task of classification is "quite difficult and confused." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). The Supreme Court has observed that the "prototypical example of an interpretive rule issued by an agency [is one] [that] advise[s] the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (internal quotation marks omitted). More recently, acknowledging the difficulties attendant to drawing the distinction between the two types of rules, the Court reinforced that "it suffices to say that the critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez*, 135 S. Ct. at 1204 (internal quotation marks omitted).

The D.C. Circuit draws the line of demarcation between the two types of rules in a similar fashion. In *Mendoza v. Perez*, the Circuit explained that "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy," whereas an interpretive rule "describes the agency's view of the meaning of an existing statute or regulation." 754 F.3d 1002, 1021 (D.C. Cir. 2014) (quoting *Batterton v. Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980). The distinguishing

---

[2] Accordingly, the court does not address whether, under 5 U.S.C. § 706(2)(A), the FTC staff's decision to apply the TSR's robocall regulation to soundboard technology-initiated calls and to disavow the September 2009 Letter was an unlawful arbitrary and capricious act. Plaintiff has not advanced that claim.

characteristic between the two, therefore, "is whether the new rule effects a 'substantive' regulatory change to the statutory or regulatory regime." *Id.* (citing *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011). Stated another way, "[t]o be interpretative, a rule 'must derive a proposition from an existing document whose meaning compels or logically justifies the proposition.'" *Id.* (quoting *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010)).

Applying those principles here, the November 2016 Letter is an interpretive rule. The Letter begins with an explanation of why the FTC staff is revisiting the September 2009 Letter. Nov. 2016 Letter at 1–2 ("[S]ince we issued the letter in 2009, staff has seen evidence of the widespread use of soundboard technology in a manner that does not represent a normal, continuous, two-way conversation between the call recipient and a live person."). It then cites to the relevant TSR provision—the robocall regulation—barring telemarketers from initiating "any outbound telephone call that delivers a prerecorded message" without prior written consent from consumers, *id.* at 3 (quoting 16 C.F.R. § 310.4(b)(1)(v)), and announces that, in light of newly acquired facts about soundboard technology, "[soundboard calls] are subject to the TSR's prerecorded call provisions because . . . [they] 'deliver a prerecorded message' as set forth in the plain language of the rule." Nov. 2016 Letter at 3. That determination does not supplement or effect a change to the statutory or regulatory scheme applicable to telemarketers. Rather, it communicates to the telemarketing industry the agency's view that an existing regulation now applies to a particular form of telemarketing technology as currently used by the industry. That is a "quintessential interpretive rule." *Flytenow, Inc. v. Fed. Aviation Admin.*, 808 F.3d 882, 889 (D.C. Cir. 2016) (holding that a FAA letter conveying the agency's position that a proposed flight-sharing service would be a "common carrier," as defined by the FAA's regulations, and therefore

would require commercial pilot licenses, "is a quintessential interpretative rule, as it was 'issued by an agency to advise the public of the agency's construction of the statutes and rules it administers'" (quoting *Shalala*, 514 U.S. at 99)).

That the November 2016 Letter announced a new position—and, in so doing, took the telemarketing industry by surprise—does not render it a legislative rule. It is beyond dispute that agencies are free to adopt a position that reverses or substantially deviates from an earlier one. *See Perez*, 135 S. Ct. at 1207. Such a change does not subject the agency's action to the APA's notice-and-comment requirements. "Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule." *Perez*, 135 S. Ct. at 1206. Here, there can be little doubt that the FTC staff's earlier opinion on soundboard technology, the September 2009 Letter, was an interpretive rule. *See Flytenow*, 808 F.3d at 889. The decision to rescind that opinion did not change the fundamental character of the agency's action and transform an interpretive rule into a legislative one.

Plaintiff advances three main arguments in opposition to this outcome. First, it asserts that the November 2016 Letter is a legislative rule because it has a "practically binding" effect on the telemarketing industry—it all but compels telemarketers to abandon use of soundboard technology to initiate calls. In doing so, Plaintiff relies heavily on *Appalachian Power v. EPA*. Specifically, Plaintiff seizes on the D.C. Circuit's statement that, "if [an agency action] leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'" Pl.'s Mot. at 16 (citing *Appalachian Power Co.*, 208 F.3d at 1021). Although the denial of permits is not at issue here, Plaintiff equates such specific agency authority with an agency's general

enforcement power and argues that the November 2016 Letter is interpretive because it "rigidly demands compliance . . . on pain of FTC enforcement action." Pl.'s Mot. at 17.

Plaintiff's reliance on *Appalachian Power*, and the "'practically binding doctrine,'" *id.*, is unavailing for two reasons. First, the above-cited quotation from *Appalachian Power* concerns whether an agency action is "final," not whether it is an interpretive or legislative rule. *See* 208 F.3d at 1020–21. That much is made clear when, in the same section of the opinion in which the quoted text appears, the court discusses the two *Bennett* finality factors and ultimately concludes that the agency action at issue there "is final agency action." *Id.* at 1022–23. Second, to the extent post-*Appalachian Power* cases have relied on the "practically binding" formulation, they have done so when distinguishing, not between interpretive rules and legislative rules, but between legislative rules and a different category of agency actions exempt from notice and comment— policy statements. *See, e.g.*, *Elec. Privacy Info. Ctr.*, 653 F.3d at 7; *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). Indeed, Plaintiff has cited no authority for the proposition that whenever an agency action puts a private party to the choice of either complying with the agency's interpretation of a statute or regulation or risking an enforcement action the agency is acting legislatively. Accordingly, the fact that the November 2016 Letter puts the telemarketing industry to the unenviable choice of complying with the robocall regulation or inviting enforcement does not, by itself, render the Letter a legislative rule.

Next, Plaintiff argues that the November 2016 Letter is a legislative rule because "[t]he FTC's newfound position on the reach of the robocall prohibition is flatly inconsistent with that provision of the TSR." Pl.'s Mot. at 20. Plaintiff devotes considerable energy to this argument, asserting that the November 2016 Letter is premised on a misreading of the TSR and a misunderstanding of soundboard technology. *Id.* at 20–30. These arguments read as if Plaintiff is

challenging the agency's action on the merits, yet Plaintiff concedes that its "point is *not* to persuade this Court to vacate the November 10 letter as arbitrary and capricious."  Pl.'s Reply, ECF No. 12, at 14 (emphasis added).[3]  Instead, Plaintiff says "it presented the counterpoint to the FTC's position on the merits of soundboard only for the purpose of demonstrating why notice-and-comment rulemaking was required."  *Id.*  Plaintiff, however, cites no authority for the proposition that courts must consider the degree to which an agency would benefit from the notice-and-comment process when deciding whether an agency action is a legislative rule.  Indeed, it is hard to conceive how such a "benefit standard" would operate in practice.  That the FTC could have derived some benefit from notice-and-comment rulemaking does not render the November 2016 Letter a legislative rule.

Finally, Plaintiff argues that the "ruinous consequences" of the FTC's new position on the telemarketing industry warrants treating the November 2016 Letter as a legislative rule.  Pl.'s Mot. at 30; Pl.'s Reply at 15.  Once more, Plaintiff cites no authority to support its position, and it is hard to conceive how such a subjective criteria would operate in practice.  Agency actions unquestionably can have a profound impact on an industry's operations.  But the degree of impact does not, as a legal matter, dictate whether an agency action is legislative.

Accordingly, the court concludes that the November 2016 Letter is an interpretive rule under the APA and, thus, the FTC need not have promulgated it through notice and comment. Therefore, the court will enter judgment in favor of the FTC on Plaintiff's APA claim.

---

[3] Although Plaintiff's counsel at oral argument raised the possibility of amending the Complaint to add a claim under 5 U.S.C. § 706(2)(A), which would assert that the November 2016 Letter violates the APA because it is arbitrary and capricious, Oral Arg. Tr. at 25, Plaintiff has yet to file a motion seeking leave to amend.

C.      Whether the TSR Amendment as Applied to Soundboard Calls Violates the
        First Amendment

The court now turns to Plaintiff's First Amendment claim.  Plaintiff asserts that subjecting

soundboard technology to the robocall regulation violates the First Amendment because it

constitutes an impermissible content-based restriction on the speech of Plaintiff's members who

engage in charitable fundraising.  Pl.'s Mot. at 31–40; Pl.'s Reply at 16–21.  Under the First

Amendment, "the government has no power to restrict expression because of its message, its ideas,

its subject matter, or its content."  *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 95

(1972).  "Content-based laws—those that target speech based on its communicative content—are

presumptively unconstitutional and may be justified only if the government proves that they are

narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. ___, ___,

135 S. Ct. 2218, 2226 (2015).  That level of review, known as strict scrutiny, presents a high bar.

*Id.* at 2227; *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (describing it as a "rare case" for a law

to survive strict scrutiny).  Government regulations related to speech but not directed at the *content*

of the speech are considered content-neutral regulations.  Content-neutral regulations are

permissible, "so long as they are designed to serve a substantial government interest and do not

unreasonably limit alternative avenues of communication."  *City of Renton v. Playtime Theatres,*

*Inc.*, 475 U.S. 41, 47 (1986).  Permissible, content-neutral regulations of speech include

regulations of the time, place, and manner in which speech is expressed in order to serve legitimate

government interests.  *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984).

Plaintiff argues that the November 2016 Letter is a content-based restriction on speech

because the robocall regulation, to which soundboard calls are now subject, is itself a content-

based regulation.  The robocall regulation bars all pre-recorded calls whose purpose is to induce

the purchase of any good or service, absent the call recipient's prior written consent.  16 C.F.R.

§ 310.4(b)(1)(v)(A). The written-consent requirement also applies to calls soliciting charitable donations from *new* donors, but does not apply to calls soliciting donations from *prior* donors or members of the non-profit organization on whose behalf the call is made. *Id.* § 310.4(b)(1)(v)(B). Plaintiff claims that the robocall regulation's carve-out for solicitation calls made to prior donors or members constitutes a content-based regulation of speech, because the FTC must look at what is said during the call—whether the caller requests a *first-time* charitable donation or a *repeated* charitable donation—to determine if the written-consent requirement applies. Pl.'s Reply at 17–18. The FTC responds that the restriction is content-neutral because its applicability "turns on the caller's relationship with the consumer rather than what may be said in the calls." Def.'s Opp'n at 29.

The FTC has the better argument. The robocall regulation's distinction between charitable solicitations to existing donors or members and potential new donors is a content-neutral restriction. It distinguishes calls based on who the recipient is—a prior donor or a potential new donor—not on what is being said.

As the FTC correctly points out, every court that has considered one of these types of robocall restrictions has held that a distinction based on the caller-recipient relationship does not violate the First Amendment. Def.'s Opp'n at 29–30; s*ee Bland v. Fessler*, 88 F.3d 729, 733–34 (9th Cir. 1996) (upholding state anti-robocall statute because exemptions were based on existing relationships and were therefore reasonable time, place, or manner restrictions); *Van Bergen v. Minnesota*, 59 F.3d 1541, 1553, 1556 (8th Cir. 1995) (upholding state statute with exemptions for messages regarding school attendance, messages about work schedules, and messages from companies to current subscribers, as acceptable content-neutral time, place, or manner regulation); *Gresham v. Picker (Picker)*, No. 16-01848, 2016 WL 5870809, at *3, 7–8 (E.D. Cal. Oct. 7, 2016)

(holding state robocall regulation that exempted calls from schools about student attendance, calls from government agencies related to emergencies, and other types of calls by certain entities drew permissible relationship-based, consent-based, or emergency-based distinctions), *appeal docketed*, No. 16-16829 (9th Cir. Oct. 12, 2016); *Gresham v. Swanson (Swanson)*, No. 16-1420, 2016 WL 4027767, at *1–2 (D. Minn. July 27, 2016) (upholding statute at issue in *Van Bergen*, 59 F.2d 1541, as a constitutionally permissible time, place, and manner restriction), *appeal docketed*, No. 16-3219 (8th Cir. July 28, 2016).

Most recently, in *Patriotic Veterans v. Zoeller*, the Seventh Circuit held that exceptions to a state robocall regulation for messages from school districts to students, parents, or employees, or messages to subscribers with whom the caller has a current relationship, were valid time, place, and manner restrictions, not content-based discrimination. 845 F.3d 303, 304–05 (7th Cir. 2017). "The . . . exceptions . . . depend on the relation between the caller and the recipient, not on what the caller proposes to say . . . . The exceptions collectively concern who may be called, not what may be said, and therefore do not establish content discrimination." *Id.* at 305.

So it is here. The robocall regulation does not require the FTC to review a call's content to determine whether the written-consent requirement applies to a pre-recorded charitable call. It need only determine whether the call's recipient is either a potential first-time donor or a prior donor or member. If the recipient falls into the first category, then the written-consent requirement applies; if she falls into the second, then it does not. The distinction is plainly relationship-based and does not constitute a content-based restriction on speech.

Plaintiff relies on two cases—*Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015), and *Gresham v. Rutledge*, 198 F. Supp. 3d 965 (E.D. Ark. 2016)—to support its claim that the robocall regulation is a content-based restriction. Pl.'s Mot. at 34–39; Pl.'s Reply at 17–18. Those cases are

inapposite.  In *Cahaly*, the court struck down a state robocall regulation as facially content-based because "it applies to calls with a consumer or political message but does not reach calls made for any other purpose."  796 F.3d at 404–05.  The robocall regulation at issue here does not contain a similar facially content-based provision.  Separately, in *Gresham v. Rutledge*, the parties "agree[d] that the statute is a content-based restriction on speech."  198 F. Supp. 3d at 969.  Consequently, *Gresham* provides no guidance as to whether the TSR's robocall regulation is content-based.

Plaintiff's reliance on *Reed v. Town of Gilbert* likewise is misplaced.  135 S. Ct. 2218, 2222 (2015).  *Reed* does not hold, or even suggest, that a speech restriction based upon the relationship of the speaker and the listener is a content-based restriction.  *See Patriotic Veterans*, 845 F.3d at 305–06 ("Because Indiana does not discriminate by content—the statute determines who may be called, not what message may be conveyed—these decisions have not been called into question by *Reed*."); *Picker*, 2016 WL 5870809 at *7 (finding that *Reed* did not reach "relationship-based, consent-based, or emergency-based distinctions"); *Swanson*, 2016 WL 4027767, at *2 ("The court does not interpret *Reed* to expand the definition of content-based restrictions at all, let alone to the extent required to render the [statute] a content-based restriction.").

Having concluded that the TSR's robocall regulation is content neutral, the regulation easily satisfies intermediate scrutiny.  *See A.N.S.W.E.R. Coalition (Act Now to Stop War and End Racism) v. Basham*, 845 F.3d 1199, 1212–13 (D.C. Cir. 2017).  The TSR's restrictions on charitable pre-recorded messages is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels" of communication.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  By requiring telemarketers to obtain written consent from potential first-time donors, the robocall regulation plainly advances the government's recognized

interest in protecting against unwarranted intrusions into a person's home or pocket.   *See Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)); *Patriotic Veterans*, 845 F.3d at 305 ("No one can deny the legitimacy of the state's goal:  Preventing the phone . . . from frequently ringing with unwanted calls."); *Van Bergen*, 59 F.3d at 1554 ("Residential privacy is a significant government interest.").   The carve-out for calls made to prior donors and members is consistent with that purpose.  By having made a donation or becoming a member of the organization, the recipient has effectively signaled her consent to receive a solicitation from the charity.  Thus, as the FTC puts it, the carve-out "allows charities to communicate freely with their members and donors while sparing other consumers from an onslaught of recorded solicitations by a 'virtually infinite array' of other organizations."  Def.'s Opp'n at 34 (quoting 73 Fed. Reg. at 51,194).

The robocall regulation also leaves "open ample alternative channels" of communication between charities and first-time donors.  Charities can use, among other things, media advertising, mailings, websites, and in-person solicitations to reach new donors.  They also can use live callers instead of pre-recorded messages.  Accordingly, the robocall regulation satisfies intermediate scrutiny and does not offend the First Amendment.

## V.     CONCLUSION

For the foregoing reasons, the court denies Plaintiff's Motion for Summary Judgment and

grants Defendant's Motion for Summary Judgment.

A separate Order accompanies this Memorandum Opinion.


Dated:  April 24, 2017                                      Amit P. Mehta
                                                            United States District Judge